UNITED STATES,

v.

John GAMBONE, Sr., Anthony Gambone, William Murdoch, and Robert Carl Meixner.

Nos. 00–176–1, 00–176–6, 00–176–2, 00–176–3.

United States District Court, E.D. Pennsylvania.

Sept. 4, 2001.

Kristin R. Hayes, Nancy Beam Winter, U.S. Attorney's Office, Philadelphia, PA, for Plaintiff.

Donald J. Goldberg, J. Shane Creamer, Dilworth Paxon LLP, Philadelphia, PA,

Thomas A. Bergstrom, Malvern, PA, John Rogers Carroll, Carroll & Carroll, James C. Schwartzman, James C. Schwartzman & Associates, Thomas Colas Carroll, Carroll & Cedrone, Mary E. Kohart, Drinker Biddle & Reath LLP, Philadelphia, PA, for Defendants.

## *MEMORANDUM*

PADOVA, District Judge.

Before the Court are various post-trial motions filed by Defendants John Gambone, Sr., Anthony Gambone, William Murdoch, and Robert Carl Meixner, who were convicted on charges of conspiracy to defraud the United States in violation of 18 U.S.C. § 371 and individual charges of willfully subscribing false tax returns under penalty of perjury in violation of 26 U.S.C. § 7206(1). Defendants John Gambone, Sr. and Anthony Gambone were also convicted on 59 individual counts of aiding and assisting in the filing of fraudulent tax documents in violation of 26 U.S.C. § 7206(2). For the reasons that follow, the Court grants the Motion for Judgment of Acquittal as to Defendant John Gambone, Sr. on Count 2, but denies the Motion as to said Defendant on all other counts. The Court grants the Motion for Judgment of Acquittal as to Defendant Anthony Gambone on Count 3, but denies the Motion as to said Defendant with respect to all other counts. The Court denies the Motion for Judgment of Acquittal as to Defendant William Murdoch on the conspiracy count (Count 1), but grants judgment of acquittal as to said Defendant on the substantive count (Count 4). The Court grants the Motion for Judgment of Acquittal as to Defendant Robert Carl Meixner on the conspiracy count (Count 1), but denies the Motion as to said Defendant on the substantive count (Count 6). The Court denies Defendants' Motions for a new trial on all asserted grounds.

## I. Background

On November 17, 2000, Defendants John Gambone, Sr., Anthony Gambone, William Murdoch, and Robert Carl Meixner, were convicted following a jury trial of conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (Count 1). The individual defendants were also convicted of willfully making and subscribing false tax returns in violation of 26 U.S.C. § 7206(1) (Count 2—John Gambone, Sr.; Count 3—Anthony Gambone; Count 4—William Murdoch; Count 6—Robert Carl Meixner). Defendants John Gambone, Sr. and Anthony Gambone were convicted of 59 counts of willfully aiding and assisting in the preparation of false tax returns (Counts 7–42, 44–56, 58–67). At trial, each of the Defendants moved for judgment of acquittal on all of the counts pursuant to Federal Rule of Criminal Procedure 29(a).[1] The Court reserved decision on the motions pursuant to Rule 29(b).[2] After verdict, Defendants renewed their motions pursuant to Rule 29(c).[3] Defendants also

---

1. Defendants Anthony and John Gambone, Sr. moved for judgment of acquittal as to Counts 7–67. N.T. 11/7/00 at 161; N.T. 11/8/00 at 3. Anthony Gambone also moved for acquittal on Counts 1 and 3. Doc. No. 164. Defendant William Murdoch moved for judgment of acquittal on Counts 1 and 4. N.T. 11/9/00 at 215. Defendant Robert Carl Meixner moved for acquittal on Counts 1 and 6. Doc. 165. The Court accepted Rule 29 motions with respect to the other counts and other defendants. N.T. 11/9/00 at 215.

2. The Court reserved decision on Counts 7–67. N.T. 11/8/00 at 10. At the close of the Government's case, the Court reserved decision with respect to all the motions for judgment of acquittal. N.T. 11/13/00 at 2, 52–53 (Count 3).

3. Doc. 203 (12/7/00, John Gambone, Sr.); Doc. 210 (1/8/01, John Gambone, Sr.); Doc. No. 206 (12/11/00, Anthony Gambone); Doc. No. 204 (12/8/00, William Murdoch); Doc. No. 200 (12/7/00, Robert Carl Meixner). The

moved for a new trial on various grounds.[4]

## II. Legal Standard

### A. Sufficiency of the Evidence

■ In deciding a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 on the basis of insufficiency of the evidence, the district court must determine whether the Government has adduced sufficient evidence respecting each element of the offense charged to permit jury consideration. *United States v. Giampa,* 758 F.2d 928, 934 (3d Cir.1985). The district court cannot and should not weigh the evidence. *Id.* Neither is the court permitted to make credibility determinations. *Id.* at 935.

■ A defendant bears a very heavy burden when challenging the sufficiency of the evidence supporting a jury's verdict. *United States v. Dent,* 149 F.3d 180, 187 (3d Cir.1998). The evidence must be weighed in the light most favorable to the government and the verdict upheld so long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Voigt,* 89 F.3d 1050, 1080 (3d Cir.1996). The defendant cannot "simply reargue [his] defense." *United States v. Smith,* 186 F.3d 290, 294 (3d Cir.1999). The Court must find there is no evidence in the record, regardless of how it is weighed, from which the jury could have found defendant guilty. *United States v. McNeill,* 887 F.2d 448, 450 (3d Cir.1989), *cert. denied,* 493 U.S. 1087, 110 S.Ct. 1152, 107 L.Ed.2d 1055 (1990). The defendant must overcome the jury's special province in matters involving witness credibility, conflicting testimony, and drawing factual inferences from circumstantial evidence. *United States v. McGlory,* 968 F.2d 309, 321 (3d Cir.1992).

### B. New trial

■ "On a defendant's motion, the court may grant a new trial to that defendant if the interests of justice so require." Fed. R.Crim.P. 33. A new trial should be granted sparingly and only to remedy a miscarriage of justice. *United States v. Copple,* 24 F.3d 535, 547 n. 17 (3d Cir. 1994).

## III. Motions for Judgment of Acquittal

### A. Conspiracy to Defraud the United States (Count 1)

Each of the Defendants was convicted of conspiracy to defraud the United States as charged in Count 1 of the Indictment. In order to sustain its burden of proof of the crime of conspiracy to defraud the United States, the government had to prove the following three elements beyond a reasonable doubt as to each defendant: (1) the existence of an agreement between at least two persons, one of whom is the defendant; (2) an overt act by one of the conspirators in furtherance of the objective of the agreement; and (3) knowledge and participation in the conspiracy by the defendant. *United States v. Adkinson,* 158 F.3d 1147, 1153 (11th Cir.1998); *United States v. Furkin,* 119 F.3d 1276, 1278 (7th Cir.1997); *United States v. Tedder,* 801 F.2d 1437, 1446 (4th Cir.1986).

The indictment charges three means (prongs) of carrying out the conspiracy to defraud, by: (1) skimming cash from their

---

Court extended the deadline for filing of the post-trial motions. N.T. 11/17/00 at 30.

4. Doc. 210 (1/8/01, John Gambone, Sr.); Doc. 214 (1/29/01, John Gambone, Sr.); Doc. No. 205 (12/11/00, Anthony Gambone); Doc. No. 209 (12/12/00, granting leave to Robert Carl Meixner to join all post-trial motions of other defendants); Doc. No. 231 (5/4/01, William Murdoch—supplemental brief in support of motion for new trial).

businesses and not reporting it on their personal tax returns; (2) paying and not reporting employee income from overtime wages, wages given in the form of fraudulent expense reimbursement, and wages paid off-payroll, thereby aiding and assisting employees in the filing of false tax returns; and (3) not reporting payments to subcontractors, thereby aiding and assisting some subcontractors in the failure to report the income. Indictment ¶ 13. John Gambone, Sr. and Anthony Gambone were charged in all three prongs of the conspiracy, while Defendants William Murdoch and Robert Carl Meixner were charged only in the overtime/fraudulent expense reimbursement prong. Thus, in order to find that Defendants John Gambone, Sr. and Anthony Gambone are entitled to judgments of acquittal, the Court would need to find that the evidence was insufficient as to each of the three prongs charged in the Indictment. In order to find that Defendants William Murdoch and Robert Carl Meixner are entitled to judgments of acquittal, the Court need only find that the evidence is insufficient as to the second prong.

The Court will begin with an analysis of prong two, in which all four of the Defendants were charged, and then proceed to analysis of prongs one and three with respect to Defendants John Gambone, Sr. and Anthony Gambone.

### 1. Overtime/Fraudulent Expense Reimbursement (Prong 2)

█ With respect to prong two of the conspiracy, the Court determines that the evidence was sufficient for any rational jury to find, beyond a reasonable doubt, that there was an agreement to defraud the United States and, further, that Defendants John Gambone, Sr. and Anthony Gambone were knowing and willful members of the sub-scheme. In the Overtime/Fraudulent Expense Reimbursement prong, the Indictment alleged that the Defendants conspired to defraud the United States by paying wages off-payroll and in the form of fraudulent expense reimbursement payments and failing to report this income, thereby assisting employees in filing false tax returns.

At trial, the following evidence was presented.[5] Frank Ruser and Thomas Gaasche, two controllers of the Gambone Brothers Construction Company, testified that overtime was being paid straight-time without any taxes taken out. N.T. 10/26/00 at 248–54, 256, 261 (Frank Ruser); N.T. 11/2/00 at 167–68, 262–64 (Thomas Gaasche). The testimony established that these policies regarding off-payroll payment of wages and non-reporting originated from John and Anthony Gambone directly, who further understood that the practice was improper. See N.T. 10/26/00 at 248–54, 256, 261 (Ruser); N.T. 10/31/00 at 47–49, 51 (John Zangari); N.T. 11/2/00 at 167–68, 262–64 (Gaasche); N.T. 11/3/00 at 70–73 (Cindy Murray).

Employees involved in payroll testified to the practice of paying employees their overtime wages in a separate check with no taxes withheld. N.T. 10/25/00 at 152–53 (Blendine Ozorowski); 11/3/00 at 70–73

---

5. Defendants assert that the only evidence that could properly be considered by the jury was that unrelated to the provision of the false W–2s, because 26 U.S.C. § 7204 provides the exclusive sanction for the provision of false W–2s to employees. The Court notes that even disregarding the actual provision of the false W–2s, the evidence was sufficient to support the jury's guilty verdict on the basis of the second prong of the conspiracy as to John Gambone, Sr., Anthony Gambone, and William Murdoch. With respect to the contention that all actions predicate to the filing of the W–2s also be eliminated from consideration, the Court refers to its more detailed discussion of that issue in the context of the § 7206(2) convictions.

(Cindy Murray). Numerous employees testified that they were paid in this manner, and that they understood that they need not report the income since there was no withholding. *See, e.g.,* N.T. 10/26/00 at 151 (Joseph Zeall); N.T. 10/27/00 at 35–36 (Karen Mengel); N.T. 10/27/00 at 84, 91 (Julia Tamaki); N.T. 10/27/00 at 221 (Robert Olivieri); N.T. 11/1/00 at 206–07 (David Picariello). Individual employees testified to being told that the overtime was paid "off the books" or "under the table." N.T. 11/6/00 at 177 (Stephen King); N.T. 10/26/00 at 85–89 (Joseph Kuniewicz); N.T. 11/6/00 at 239–41 (James Leonard). John Zangari testified that when he hired new employees, he explained the overtime system and that "their overtime check was straight cash and it wouldn't be claimed." N.T. 10/31/00 at 39–40.

The Court concludes that the evidence presented at trial was sufficient such that any rational trier of fact could have found beyond a reasonable doubt the existence of a prong-two payment scheme.[6] All of the testimony, and the reasonable inferences drawn from it, was sufficient to establish that Defendants John Gambone, Sr. and Anthony Gambone created a company wide system that paid employees significant wages off-payroll, with no taxes taken out, with the intention that neither the company nor the employees would report the income. The system was designed to allow the company to pay less in total wages to its employees, but allow the employees to keep a greater share of the wages by defrauding the IRS. Moreover, the evidence provided a sufficient basis for the jury to conclude beyond a reasonable doubt that both John Gambone, Sr. and Anthony Gambone agreed to this conspiracy with knowledge and intent.

■ Defendant William Murdoch contends that the evidence presented at trial was insufficient to establish that he joined the conspiracy with the intent to the defraud the United States. Murdoch claims that the evidence established only that he signed the checks, but established no knowledge with respect to the W–2s or 1099s or the failure of company's employees to report the income. The Court disagrees, and concludes that. the evidence was sufficient to sustain his conviction.

The following evidence was presented at trial. Murdoch, who has worked at Gambone Brother since 1957, was the second signer on the payroll checks. N.T. 11/3/00 at 79 (Murray). The evidence established that the accounts payable checks for overtime went to John Gambone, Sr. and then to William Murdoch with the timecards attached. N.T. 10/25/00 at 217–18 (Ozorowski); N.T. 10/27/00 at 25–26 (Mengel). The timecards reflected all of the pay, including overtime paid off-payroll. N.T. 10/31/00 at 167 (Zangari). The timecards were marked "OP" by the payroll clerk. N.T. 10/27/00 at 80–81. Murdoch reviewed the checks and materials and would sometimes require changes in the amounts, or void them entirely. N.T. 10/27/00 at 80–81 (Mengel). Murdoch removed his check from among the signed checks. N.T. 10/27/00 at 44 (Mengel). There was also testimony establishing Murdoch's direct or inferred knowledge that employees were being paid such that taxes were not withheld. John Zangari and David Picariello testified that Murdoch was present when John Gambone, Sr. arranged to allow them to have mortgage payments taken out of their pre-tax earnings. N.T. 10/31/00 at 74–77 (Zangari); 11/1/00 at 218–24 (Picariello). Murdoch drew up papers and explained how such payments would work.

---

**6.** The evidence of the "straight-time" overtime aspect of the scheme was sufficient basis for a prong-two conviction.

*Id.* Picariello testified that it was Murdoch who explained to him the benefit of having mortgage payments taken out pretax—that it would be "beneficial" because the taxes would be taken out of a lower amount. N.T. 11/1/00 at 222–23. It could be reasonably inferred from this testimony that Murdoch understood that the purpose of this arrangement was to allow the employee to refrain from reporting the income and, therefore, to avoid having to pay taxes thereon.

The Court determines that this evidence was sufficient to establish that Murdoch was a knowing and voluntary member of the conspiracy, and that he joined in the conspiracy's goal of defrauding the IRS. The evidence was sufficient for the jury to conclude that he had knowledge of the payment scheme, that he actively participated in it, and that he understood its goals. Murdoch's daily presence in the office of the company bolsters the reasonable inference that he possessed extensive knowledge of the conspiracy. The Court therefore denies Defendant Murdoch's motion for judgment of acquittal.

■ Defendant Robert Carl Meixner also contends that the evidence against him was insufficient to establish his membership in the conspiracy. At trial, the Government attempted to link Meixner to the conspiracy through his position as a field superintendent whose responsibilities included hiring employees and reviewing time cards. Notwithstanding Defendant's apparent opportunity to obtain knowledge of and to agree to the conspiracy, the Court agrees with Defendant that the evidence actually presented at trial was insufficient for any rational trier of fact to find beyond a reasonable doubt that he joined the conspiracy with the intent to defraud the United States.

In support of the conviction, the Government points to testimony that Meixner, in his position as Superintendent, authorized raises in the form of expense reimbursement. *See, e.g.*, N.T. 11/3/00 at 225–29 (Philip Honsberger); N.T. 11/3/00 at 176–78 (Richard Hunter); N.T. 10/27/00 at 207–08 (Paul Mills). In the Court's view, however, this evidence is insufficient to establish that Defendant Meixner had the intent to join the conspiracy to defraud the United States. In particular, the evidence did not establish that the expense allowances were intended to remain unreported, or that they did not cover legitimate vehicle expenses.[7] Though there was some testimony regarding particular employees who received such expense money without having legitimate expenses, the evidence at trial did not establish that Meixner's purpose in giving the "expense money as raises" was to further this conspiratorial objective of defrauding the IRS.

The Government points to specific testimony regarding conversations that Meixner had with other employees as proof of Meixner's knowledge and assent to the goals of the conspiracy. The Court, however, does not agree with the Government's characterization of the statements as they relate to proving such knowledge and agreement. First, the Court disagrees that Meixner's comment that employees should "sit on it," referring to the belated 1099s given to employees for their 1992 and 1993 unreported income, is fairly interpreted as evidencing prior knowledge of effort to flout rules.[8] Meixner's state-

---

7. The testimony regarding Defendant Meixner's hiring of employees thus differed in substantial respect from that offered by John Zangari, who held the same position at a prior time, and who described his discussions with employees regarding "straight-time for overtime."

8. The Government argues that "[i]n light of the other evidence of the Gambones' pattern of refusing to follow the rules despite being audited and told their practices were wrong, this statement [of Meixner] could be fairly interpreted as evidencing knowledge of efforts

ment to John Zangari that "if we ever wanted to do anything, if we ever quit or did anything, all we would have to do is call the IRS and tell them the way we were paid" demonstrates knowledge that Meixner knew that he was being paid improperly, but does not go far enough in demonstrating an intent to join the defraud conspiracy. *See* N.T. 10/31/00 at 98–99 (Zangari). Similarly, his statement to Phillip Honsberger that "[i]f anything ever happened, Gambone would have to pay you half time, and that would—and everything would be a wash," reveals nothing about Meixner's knowledge of a conspiracy to defraud. N.T. 11/3/00 at 226–27. Though drawing inferences from circumstantial evidence is within the jury's special province, in this case the Court agrees that it is not possible to draw an inference from this testimony of Meixner's state of mind sufficient to support the proposition that he joined the conspiracy.

Thus, the Court concludes that the Government failed to provide evidence at trial that Defendant Meixner knew the goal of the conspiracy was to defraud the United States, and that he had the knowledge and intent willfully to join that conspiracy. At best, the evidence presented demonstrated only that Meixner came to know that he and perhaps other employees were being paid improperly.[9] This falls far short of establishing his agreement to defraud the United States. For that reason, the Court concludes that Defendant Meixner is enti-

tled to judgment of acquittal as to Count 1 of the Indictment.

### 2. Cash Skimming (Prong 1)

█ The Court also determines that the evidence was sufficient to support the convictions of John Gambone, Sr. and Anthony Gambone based on the cash skimming prong of the scheme. Indictment ¶¶ 14–17. The following evidence was presented at trial. Defendant John Gambone received substantial sums of cash, N.T. 11/1/00 at 155–56 (Robert Sylvester), and he split the monies with his brothers Anthony and Joseph. N.T. 11/1/00 at 157 (Sylvester). Upon execution of the government search warrant, $65,815 was seized from a safe in John Gambone, Sr.'s house. N.T. 11/9/00 at 17 (David Patella). Of this amount, about $30,000 belonged to Robert Sylvester. N.T. 11/1/00 at 189. Cash was received in payment for "extras" on houses purchased from Gambone Brothers. N.T. 11/1/00 at 161; N.T. 10/30/00 at 33, 37, 43 (Anne Dozer). Other employees also testified to seeing cash come in through business transactions. N.T. 10/27/00 at 90 (Mengel); N.T. 10/31/00 at 104–106 (Zangari). John Gambone would bring home cash and give it to his wife, and tell her to purchase bonds if she could. N.T. 11/1/00 at 156, 162. On one occasion, John Gambone asked Robert Sylvester to accompany Mrs. Gambone to the bank with $70,000 for the purpose of purchasing savings bonds. N.T. 11/1/00 at 163–64. Tom Gaasche, the company con-

to do the same in 1995." Govt. Omnibus Brief at 30. The Court observes, however, that none of the evidence links this "pattern" of behavior with this particular Defendant. It would be circular to construe Meixner's comment in light of the actions and practices of the other conspirators in carrying out the conspiracy in order to prove that Meixner actually joined into an agreement with those other Defendants.

9. Notably, the Defendant's generic statements regarding how employees were paid might not even establish knowledge of wrongdoing by giving raises in the form of expense reimbursements. His statements might only have related to knowledge that the overtime aspect of the scheme was wrong. Because the evidence relating to Meixner's hiring practices were limited to giving raises in the form of expense allowances, this gap would be crucial.

troller, testified that in 1995, John Gambone, Sr., told him he had seen someone snooping around and that he thought it might be an FBI agent. N.T. 11/2/00 at 140–41. Gambone instructed Gaasche to book some $150,000 in funds, as well as funds to three individuals—John Gambone, Jr., Lydia Lupo, and Anne Dozer—all of whom worked for Continental Realty and had received commissions. N.T. 11/2/00 at 140–42.

The evidence at trial was thus sufficient for any rational jury to infer and conclude, beyond a reasonable doubt, that there was a prong one cash skimming sub-scheme as charged in the Indictment, and that John and Anthony Gambone agreed to this sub-scheme in order to defraud the United States. The evidence was sufficient for any rational trier of fact to determine beyond a reasonable doubt that cash was received from the business, that such cash was distributed to John and Anthony Gambone, and that funds were hidden and not reported, with at least some of the funds being used to purchase savings bonds.

### 3. *Failure to Report Payments to Sub–Contractors (Prong 3)*

■ With respect to the subcontractor scheme, Indictment ¶ 26, the evidence was also sufficient to sustain the jury verdict. The following evidence was presented at trial. Each year, a list of vendors paid during the year was printed. N.T. 10/27/00 at 98 (Julia Tamaki). This list would go to Tom Gaasche, who would cross out corporations and any parties receiving less than $600. N.T. 11/2/00 at 192

(Gaasche). John Gambone, Sr., would then review the list and cross out some and circle others. *Id.* The circled parties would receive 1099s. *Id.* The lists had roughly 100–120 employees and 50–60 subcontractors. *Id.* at 193. Approximately 20–30 of the entities on the original list would receive 1099s. N.T. 10/27/00 at 100. Some entities that should have received 1099s were crossed off the list. *Id.* Moreover, Anthony Gambone negotiated lower rates with subcontractors on the basis that the Company would not report the income. N.T. 10/31/00 at 60–61 (Zangari) (statement by Gambone that "we're going to pay you this amount per square foot because we're not going to claim taxes.") John Zangari also negotiated lower rates with subcontractors in this manner. *Id.* at 61. One subcontractor testified about direct conversations with John Gambone and Anthony Gambone regarding the non-reporting of the income. N.T. 11/1/00 at 65–66 (David Ciabattoni).[10]

The evidence at trial provided sufficient basis for any rational trier of fact to find beyond a reasonable doubt that a third-prong sub-scheme existed, and that John and Anthony Gambone joined and participated in such a sub-scheme in order to defraud the United States.

### B. *Substantive Counts (Counts 2, 3, 4, 6)*

■ Each of the Defendants was charged and convicted with a substantive tax violation relating to false tax returns filed in 1993 or 1994, in violation of 26 U.S.C. § 7206(1). Section 7206(1) provides

---

**10.** At trial, Defendants argued that David Ciabattoni was actually a corporation and thus was not entitled to receive a Form 1099. Defendants presented evidence during cross-examination that at the time Ciabattoni worked for Gambones, he remained registered as a corporation. N.T. 11/2/00 at 69–70. However, the witness also testified that he had not acted as a corporation since 1989.

N.T. 11/2/00 at 90. Furthermore, he testified that he arranged with Anthony Gambone to be paid with checks made out to him personally. N.T. 11/1/00 at 66. The Court concludes that, with respect to this aspect of the witness' testimony, Defendants have failed to overcome the jury's special province in the matter of witness credibility and conflicting testimony. *See McGlory*, 968 F.2d at 321.

that: "Any person who willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter [shall be guilty of a crime]." In order to establish a violation of § 7206(1), the Government must establish that: (1) the defendant made and subscribed a return which was false as to a material matter; (2) the return contained a written declaration that it was made under the penalties of perjury; (3) the defendant did not believe the return was true and correct as to every material matter; and (4) the defendant falsely subscribed to the return willfully, with the specific intent to violate the law. *United States v. Gollapudi,* 130 F.3d 66, 71–72 (3d Cir.1997) (citing *United States v. Bishop,* 412 U.S. 346, 350, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973)).

### 1. *John Gambone, Sr. (Count 2)*

█ In Count 2, Defendant John Gambone, Sr. was convicted of filing a false tax return for the year 1994 under penalty of perjury. Specifically, the Indictment charged that John Gambone, Sr. failed to report approximately $52,780 in unreported income. He moves for judgment of acquittal on this Count, and contends that there was no evidence that he received the money in 1994, and further that there was insufficient evidence to demonstrate that the money should have been reported on the 1994 return. The Court concludes that, viewing the evidence in the light most favorable to the government, the evidence was insufficient for any rational jury to conclude beyond a reasonable doubt that John Gambone, Sr. was guilty of the Count 2 violation.

█ The key fact with respect to John Gambone, Sr.'s false tax return was the distribution to him of reportable cash in the year 1994.[11] The Government presented the following evidence at trial. Certain individuals made cash payments for extras on their houses, with at least some of these payments dating to 1994. N.T. 11/1/00 at 121, 124 (Barry Vesotsky); N.T. 11/3/00 at 15–16, 21–23, 24–25, 27–30 (Dok Su Yi). Anne Dozer, who worked at Continental Realty, also testified that extras were paid for in cash by the Vesotskys, the Yis, and the Koons. N.T. 10/30/00 at 33. She testified regarding particular change orders entered into with these homeowners. N.T. 10/30/00 at 53–68 (Yi), N.T. 10/30/00 at 72–74 (Koons). Dozer herself was sometimes involved in preparing and negotiating such change orders. N.T. 10/30/00 at 33.

The evidence was sufficient for the jury to find that substantial amounts of cash were received by the business. Missing, however, was evidence establishing that John Gambone, Sr. received his distribution of this cash during 1994. Dozer testified that she received her commissions from the cash payments at the time they were made, or shortly thereafter, and that she received some of the commissions in 1994. N.T. 10/30/00 at 42–43, 69. She testified that once the money was received for payment of extras and the commissions were taken out, that the money then went to the "Gambone Brothers office." N.T. 10/30/00 at 71. The fact that Dozer received her commissions in 1994, however, does not support an inference on this record that John Gambone, Sr. personally received his distribution of reportable income from Gambone Brothers in 1994.

---

11. Where an individual has an interest in a corporation, receipt of income by the corporation does not by itself constitute receipt of reportable income by the individual. *See United States v. Toushin,* 899 F.2d 617, 622–24 (7th Cir.1990). Thus, evidence showing that the company received cash in 1994 without evidence that John Gambone, Sr. also received a distribution in 1994 would be insufficient to support the § 7206(1) conviction.

Dozer's actual testimony only established that the funds went to the company's office, and not to John Gambone, Sr. personally.[12]

The testimony of Thomas Gaasche, the company controller, also failed to place the timing of the distribution in 1994. Gaasche testified that in 1995, John Gambone, Sr. came into his office and told him he had seen someone snooping around one of the samples, and that he thought it might be an FBI agent. N.T. 11/2/00 at 140–41. Gambone told Gaasche that he and each of his brothers had received $50,000 and that he wanted the money to go on the books. *Id.* He said that three individuals—John Gambone, Jr., Lydia Lupo, and Anne Dozer—had received commissions of $6,000, and to make sure these monies also got on the books. N.T. 11/2/00 at 141–42. Even assuming, however, that this testimony supported the inference that the $50,000 distributions referred to by John Gambone, Sr. came from the same cash testified to by Anne Dozer, Dok Yi, and Barry Vesotsky, the evidence was insufficient to support an inference that John Gambone, Sr. actually received his distribution in 1994 or at or around the same time as Anne Dozer. Gaasche dated his conversation with John Gambone, Sr. to the late summer of 1995. N.T. 11/2/00 at 140–41. At that time, Gambone also told Gaasche that he was also going to notify George Falconero[13] to make sure the monies got on the books by the end of the year. N.T. 11/2/00 at 141. Gaasche booked the cash in December of 1995 after the execution of the federal search warrant, but did not include any information about who delivered the cash or to which properties the monies corresponded. N.T. 11/2/00 at 148–49, 153–55. The Court concludes that while the testimony was sufficient to support the conclusion that distributions were eventually made, nothing in the testimony established that the distribution was made in 1994, as opposed to 1995. This failure of the evidence to pinpoint the timing of the distribution means that the evidence was insufficient for any rational jury to conclude, beyond a reasonable doubt, that John Gambone, Sr. received cash that should have been reported on his 1994 return. Having determined that the evidence was insufficient, the Court grants John Gambone, Sr.'s motion for judgment of acquittal on Count 2.[14]

### 2. Anthony Gambone (Count 3)

In Count 3, Defendant Anthony Gambone was convicted of filing a false tax return for the year 1994 under penalty of perjury. Specifically, the Indictment charged that Anthony Gambone failed to report approximately $52,780 in unreport-

---

**12.** During oral argument, the prosecutor stated that Anne Dozer "testified [that John Gambone, Jr.] gave [the cash] to his father in that time period." N.T. 11/9/00 at 222. Examining the record, the Court determines that this characterization overstated the witness' actual testimony regarding this important factor. Though Dozer did testify as to various transactions in which John Gambone, Jr. received cash payments, N.T. 10/30/00 at 748–52, she then testified only that the money paid for extras "goes to the office, to Gambone Brothers." *Id.* at 71.

**13.** George Falconero is a partner with Maillie Falconiero, the accounting firm handling the accounts for Gambone Brothers Organiza-

tion, Inc. and all its companies. N.T. 11/6/00 at 19–21.

**14.** The Court observes that the deficiency in the evidence with respect to the § 7206(1) violation does not affect this Court's conclusion that the evidence was sufficient for any rational trier of fact to find beyond a reasonable doubt that there was a cash skimming sub-scheme as charged in prong 1 of the conspiracy count. The key deficiency in the proof for Count 2 was proof of the timing of the distribution of cash that allegedly should have been reported on the 1994 return. Proof of this particular fact, however, was not essential to proving the prong 1 sub-scheme in the conspiracy count.

ed income. He moves for judgment of acquittal on the basis that the evidence was insufficient to establish that he received the money in the calendar year 1994.

The Court has already determined that the evidence was insufficient for any rational jury to find beyond a reasonable doubt that John Gambone, Sr. received the cash in 1994. The evidence to support that Anthony Gambone received his distribution in 1994 was even more attenuated. The Government first relies on the testimony of Thomas Gaasche, who testified that in the late summer of 1995, John Gambone, Sr. told him that he and each of his brothers received about $50,000 in cash. N.T. 11/2/00 at 140–41. As already discussed above, however, this testimony was insufficient to establish that the distributions were made to the brothers during 1994. The Government next relies on the testimony of Robert Sylvester that on one particular occasion, he saw John Gambone, Sr. with a sum of cash, and Gambone remarked that he had to "split it [cash] with [my] brothers." N.T. 11/1/00 at 157 (Sylvester). However, this undated conversation, while perhaps sufficient to establish that John Gambone, Sr. split cash distributions with his brothers, was wholly insufficient to support an inference that John Gambone, Sr. gave the $50,000 to Anthony Gambone during 1994, even if John Gambone, Sr. himself received the cash in 1994. Moreover, since the Court has concluded that the evidence was insufficient for any rational jury to conclude beyond a reasonable doubt that John Gam-

bone, Sr. received the cash during 1994, it follows that the evidence must also have been insufficient to establish that Anthony Gambone received the cash during 1994, insofar as Anthony Gambone's receipt of cash depended on his brother's initial receipt of cash from the business. Accordingly, the Court grants judgment of acquittal as to Anthony Gambone on Count 3.

### 3. *William Murdoch (Count 4)*

■ In Count 4, William Murdoch was convicted of filing a false tax return for the year 1993 under penalty of perjury. Specifically, the Indictment charged that Murdoch failed to report approximately $14,956.80 in unreported income. Murdoch moves for judgment of acquittal on Count 4. He contends that the evidence at trial was insufficient to establish that he should have reported the expense reimbursements, and that he willfully violated a known duty to report them. The Court grants acquittal on this count.

During 1993, Murdoch received $257 per week as a vehicle allowance expense. However, there was no evidence that he did not have legitimate vehicle expenses. *See, e.g.,* N.T. 11/3/00 at 86, 131–32 (Cindy Murray). More critically, even if one could infer, from the testimony that he worked in the office, that Murdoch did not have vehicle expenses or at least that he did not have $15,000 in such expenses, there was no evidence establishing that he knew he had to report the expense income.[15] Though Murdoch participated extensively in the straight-time overtime prong of the conspiracy, the evidence does

---

**15.** The Court observes that the reporting of expense reimbursement payments by an employee to the Internal Revenue Service is governed by sophisticated provisions under the tax code, with differing provisions governing the reporting of income under accountable and non-accountable plans. Because the § 7206(1) violation requires willfulness, it is not sufficient that the Government establish

that the income was reported improperly. The Government has the burden to establish that the particular defendant knew of the particular reporting requirements relating to the income, and willfully failed to report it on a document signed under penalty of perjury. Although the Government presented some evidence at trial demonstrating that some employees received expense monies without hav-

not similarly establish knowledge and intent with respect to "bogus" expense income. This lack of evidence of knowledge and intent extends to his own payments of expense income. Accordingly, the Court concludes that the evidence at trial was insufficient for any rational trier of fact to find, beyond a reasonable doubt, that Murdoch willfully subscribed the return falsely with the specific intent to violate the law. The Court therefore grants judgment of acquittal as to Count 4.

### 4. *Robert Carl Meixner (Count 6)*

█ In Count 6, Robert Carl Meixner was convicted of filing a false tax return for the year 1993 under penalty of perjury. Specifically, the Indictment charged that Meixner failed to report approximately $31,935.33. He moves for judgment of acquittal on Count 6, arguing that the evidence established only that his return did not report the "separate check" overtime and expense reimbursement payments he received during the year, but that the evidence failed to establish that this was reportable income. He further argues that the evidence failed to establish willfulness. The Court disagrees and therefore denies the motion.

At a minimum, the evidence established that Meixner received unreported overtime wages during 1993, and this income would have been reportable.[16] The follow-

ing evidence was presented at trial. The annual 1099 lists were created on the computer based on monies that were paid out of the accounts. N.T. 10/27/00 at 98 (Tamaki). The 1099s for 1993 were prepared by Julia Tamaki at the direction of Tom Gaasche, who gave her the list. N.T. 10/27/00 at 102. Statements made by Meixner and testified to by other witnesses established that he knew that he was being paid improperly. *See* N.T. 10/31/00 at 98–99 ("[I]f we ever wanted to do anything, if we ever quit or did anything, all we would have to do is call the IRS and tell them the way we were paid"); N.T. 11/3/00 at 226–27 ("If anything ever happened, Gambone would have to pay you half time, and that would—and everything would be a wash.") The Court concludes that the evidence was sufficient for any rational trier of fact to find beyond a reasonable doubt that Meixner failed to report income that should have been included on his tax return, and moreover that he knew of this obligation and willfully violated it. Meixner's motion for judgment of acquittal as to Count 6 is therefore denied.

### C. *Aiding and Assisting (Counts 7–42, 44–56, 58–67)* [17]

Defendants John Gambone, Sr. and Anthony Gambone also seek judgment of acquittal on the aiding and assisting counts pursuant to 26 U.S.C. § 7206(2).[18] Defen-

---

ing legitimate expenses, the Government failed to establish that William Murdoch knew of the reporting requirements, and that he, therefore, knew that his return was false when he signed and filed it.

16. The Court agrees, however, with respect to expense reimbursements, that there was no evidence at trial to establish that Meixner knew of his duty to report the expense monies, and that he therefore willfully violated that duty by filing a false return.

17. Defendants were also charged, but were acquitted, on Counts 43 and 57. Accordingly,

the Court will consider all references in the motions and briefs to Counts 7–67 not to include Counts 43 and 57.

18. Section 7206(2) provides:

(2) Aid or assistance.—[Any person who] [w]illfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or re-

dants contend that the convictions are based solely on evidence that the Defendants provided false W–2 forms to the employees. Citing the decision of the Court of Appeals for the Sixth Circuit in *United States v. Hughes,* 899 F.2d 1495 (6th Cir.1990), Defendants contend that 26 U.S.C. § 7204 provides the sole remedy for the violation of providing false W–2 forms to employees, and that the convictions under 26 U.S.C. § 7206(2) therefore cannot be based on the false W–2s.

The provision by an employer of a false W–2 form falls under § 7204 of the Internal Revenue Code. That section provides:

> In lieu of any other penalty provided by law (except the penalty provided by section 6674) any person required under the provisions of section 6051 to furnish a statement who willfully furnishes a false or fraudulent statement or who willfully fails to furnish a statement in the manner, at the time, and showing the information required under section 6051, or regulations prescribed thereunder, shall, for each such offense, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both.

26 U.S.C. § 7204 (1994).

In *Hughes,* the defendant was convicted of several tax code violations, including the aiding and assisting in the filing of a false document with the IRS in violation of 26 U.S.C. § 7206(2), in connection with the provision of a false W–2 for an employee.[19] Seizing upon the "in lieu of" language of § 7204, Defendant moved for acquittal before the district court on the § 7206(2) conviction, on the ground that such violations could only be prosecuted under § 7204. With respect to the false W–3 conviction, the district court concluded that "the violation of § 7204 is a lesser included violation of § 7206, and so, consonant, with defendant's request ... [the court] finds him guilty of violating the misdemeanor provisions of § 7204." [20] *United States v. Hughes,* Crim.Act. 1987 WL 33806, at *4, 1987 U.S. Dist. LEXIS 11708, at *12 (N.D.Ohio Nov. 13, 1987).

The court, however, upheld the § 7206(2) conviction for the provision of false W–2s. The court concluded:

> [T]he simple fact of providing, or helping to provide, an individual with a fraudulent W–2 is not punishable under § 7206(2) because of § 7204's "in lieu of" provisions. *However, the evidence at trial showed that Hughes went further than merely providing Griffith with the false W–2's. Based on the evidence presented, the jury could have found beyond a reasonable doubt that Hughes additionally counseled Griffith to understate her income on her income tax return, by reporting as income only that amount shown on the W–2 and not the additional income which she received as "expenses."* Defendant himself cites three cases in which persons were convicted for violating § 7206(2) by assisting and counseling individuals to file false income tax returns, part of which assistance was to provide the individuals with false W–2 forms. [citations omitted]

quired to present such return, affidavit, claim, or document ... shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $5,000, or imprisoned not more than 3 years, or both, together with the costs of prosecution.
26 U.S.C. § 7206(2) (1994).

**19.** Defendant was also convicted of one count of aiding and assisting in violation of

§ 7206(2) for filing of a false W–3. The court reduced the felony conviction to a misdemeanor conviction under § 7204. *Hughes,* 1987 WL 33806, at *4, 1987 U.S. Dist. LEXIS 11708, at *12.

**20.** The statute of limitations applicable to prosecution under § 7204 is three years. 26 U.S.C. § 6531 (1994).

In a sense, the false W–2 form is irrelevant. As long as there are other actions violative of § 7206, the fact that the defendant may also have provided an individual with a false W–2 does not prevent a § 7206 conviction.

*Hughes,* 1987 WL 33806, at *4–5, 1987 U.S. Dist. LEXIS 11708, at *12–13 (emphasis added).

On appeal, the Sixth Circuit reversed, though not with respect to the district court's interpretation of the law. Rather, the Sixth Circuit disagreed with the district court's interpretation of the evidence, concluding that a "fair reading of the evidence would not permit the jury to conclude that defendant took any action with respect to the filing of Griffith's tax return other than causing the CWA to furnish her with a false W–2 form. In particular, Griffith expressly denied that defendant gave her any advice concerning the filing of her tax return." *Hughes,* 899 F.2d at 1501.

Defendants contend that in this case, the evidence at trial established only that the Gambones provided false W–2s to its employees, and that the § 7206(2) convictions should therefore be set-aside because the evidence only proved violations of § 7204. If Defendants are correct about their characterization of the evidence, then *Hughes* and the "in lieu of" language of § 7204 stand for the proposition that Defendants can be convicted of nothing more than violations of § 7204.

█ This case presents an issue of first impression in this Circuit. Defendants have not cited, and the Court has not found, any Third Circuit law dealing with the meaning of the "in lieu of" language of § 7204, and more specifically, with the intersection of § 7204 with § 7206(2). The Court does find the reasoning of the *Hughes* court to be persuasive, however, insofar as the presentation of evidence solely making out a § 7204 violation cannot, by itself, be sufficient to establish a § 7206(2) violation. To hold as such would be to eviscerate the meaning of the "in lieu of" language.

However, conduct which involves, but is not exclusively limited to, the provision of false W–2s can be sufficient for a § 7206(2) violation. Thus, the mere fact that the provision of false W–2s was a part of the case does not mean that a § 7206(2) violation is not possible.[21] Courts have upheld § 7206(2) convictions where the schemes involved the provision of false W–2s.[22] *See United States v. MacKenzie,* 777 F.2d 811, 813 (2d Cir.1985) (involving straight time for overtime paid off the books by separate check with separate records and no withholdings); *United States v. Isaksson,* 744 F.2d 574, 575 (7th Cir.1984) (paying employees partial wages from separate accounts with no withholding to allow employees to underreport income). The Court recognizes that neither the *MacKenzie* nor the *Isaksson* court addressed the "in lieu of" aspect of § 7204.[23] However, neither did the *Hughes* court's decision foreclose the use of § 7206(2) when additional conduct was involved. This Court

**21.** The Court does not understand Defendants to be making this precise argument. Rather, the Court understands Defendants to be contending that in determining whether there is a § 7206(2) violation, the Court must disregard entirely the existence of the W–2.

**22.** Defendants claim that these cases are not applicable because those courts did not address the "in lieu of" provisions of § 7204. This Court agrees that these cases do not

entirely resolve the issue, but nevertheless finds in them support for the notion that a scheme including false W–2s may be considered under § 7206(2).

**23.** Of course, this Court also cannot speculate as to how the Second or Seventh Circuits would have ruled if faced squarely with the question of whether a § 7204 violation precluded a § 7206(2) violation in those cases.

disagrees, therefore, with Defendants' assertion that *Hughes* and *MacKenzie* and *Isaksson* are in conflict, particularly as the latter two cases both involved conduct that exceeded the mere provision of false W–2s to employees. *See MacKenzie*, 777 F.2d at 813; *Isaksson*, 744 F.2d at 575.

The Court also disagrees with Defendants' overly broad reading of *Hughes*. Defendants argue that the steps predicate to the provision of a false W–2 are not evidence which can be considered in proving a § 7206(2) case. They further argue that the company's payment scheme—the use of separate checks, for example—constitute steps predicate to the filing of the false W–2s. The Court believes Defendants' interpretation to go well beyond the actual decision articulated by the *Hughes* court. Carrying Defendants' argument to its logical conclusion, it would be impossible to have a § 7206(2) charge in which false W–2s were issued, because just about any actions taken in setting up the false payment scheme would qualify as predicates to the filing of the W–2s. Even if Defendants are correct that the steps predicate to the filing of the false W–2s must be excluded from consideration, this Court finds it untenable to exclude from consideration all the evidence relating to how the books were kept, how the accounts were managed, and how the checks were written. The district court's decision in *Hughes* fails to support Defendants' contentions, particularly since the district court initially upheld the W–2 conviction, and the appeal's court overturned the conviction based on an erroneous interpretation of the evidence, and not an erroneous articulation of the law.

■ Under this framework and understanding of the requirements of § 7206(2) in light of *Hughes* and § 7204, the Court next examines the sufficiency of the evidence. At trial, the following evidence was presented. The system provided separate checks (and therefore separate accounting) for employees' regular 40–hours and for their overtime. Individual employees testified that they were told the overtime was paid "off the books" or "under the table." N.T. 11/6/00 at 177 (Stephen King); N.T. 10/26/00 at 85–89 (Joseph Kuniewicz); N.T. 11/6/00 at 239–41 (James Leonard). John Zangari testified that when he hired employees, he explained the overtime system to the new employees that "their overtime check was straight cash and it wouldn't be claimed." N.T. 10/31/00 at 39–40. Moreover, employees testified regarding communications to the effect that they did not have to report the income to the IRS. N.T. 10/26/00 at 18–19 (Thaddeus Wienczek); N.T. 11/6/00 at 239–41 (James Leonard). Testimony was also presented indicating that the fraudulent payroll system was created by the Defendants, and was understood and intended by them to make it possible for employees not to report the income. *See* N.T. 10/26/00 at 248–54, 256, 261 (Ruser); N.T. 10/31/00 at 30–31, 48–49, 51 (Zangari); N.T. 11/2/00 at 167–68, 262–64 (Gaasche); N.T. 11/3/00 at 70–73 (Murray); N.T. 11/3/00 at 138–39 (James Schmidt).

The Court concludes that the evidence, particularly that provided by the dozens of employees who testified at trial, was sufficient for any rational jury to find beyond a reasonable doubt that Defendants aided and assisted the employees in filing false returns, beyond the mere provision of false W–2s. The Court concludes that, even excluding consideration of the W–2s themselves, the evidence was sufficient to support the convictions. The evidence was sufficient for the jury to find that the Defendants created the particular payment scheme (and persisted with that scheme even after they knew it was improper) and that they communicated, either directly or through their supervisory employees, that the funds paid without withholding would not be reported. There was evidence of

specific instances in which the Defendants indicated that payment would be made with the intention of having that payment not be reported to the IRS. This evidence goes well beyond the mere provision of false W–2s, and satisfies the "in lieu of" concerns raised by *Hughes*.

Defendants also contend that the evidence at trial was insufficient to establish the offenses because it did not establish that the Defendants specifically knew how much each particular individual employee was being paid and that the W–2s were false. The Court recognizes that the evidence in the case failed to establish such specificity of knowledge. However, the Court also observes that as the owners and managers of the company and the creators of the payment system, the Defendants had sufficient knowledge and intent to aid and assist the employees in filing false returns, even if they might not have known what particular amounts affected what particular employees. Furthermore, the fact that the Defendants did not have actual communications with every one of the employees listed in the individual counts does not mean that they did not aid and assist those employees in filing false returns with the IRS. The evidence presented at trial was sufficient to establish the Defendants' willfulness and intent with respect to the individual employees. Therefore, the Court determines that the evidence presented at trial was sufficient to establish the § 7206 violations. Accordingly, the Court denies the motion for judgment of acquittal as to Counts 7–42, 44–56, and 58–67.

**24.** Defendants' request for a new trial on this ground is an alternative to its motion for judgment of acquittal on counts 7–67.

**25.** In initially raising and briefing this issue, Defendants cited *United States v. Goldberg*, 105 F.3d 770 (1st Cir.1997) for the proposition that "foreseeable tax consequence" is not enough for conviction. Defendants asserted that the instruction was erroneous because "[t]he line between knowing that a W–2 will result in a false return and simply recognizing

## IV. Motions for New Trial

In the alternative, Defendants seek a new trial. Defendants raise four grounds for new trial. The Court will consider each of these grounds in turn.

### A. *Erroneous jury instructions for Counts 7–67*

Defendants first assert that the Court's jury charge on Counts 7–67 was "fundamentally erroneous in that it instructed the jury to presume aiding and assisting under certain facts that were insufficient as a matter of law to support that element." [24] (Doc. No. 210 at 5.) The Court instructed the jury as follows:

> I instruct you as a matter of law that if you find beyond a reasonable doubt that a defendant willfully furnished, prepared or caused to be prepared false and fraudulent documents which the defendant knew would be relied on in the preparation of income tax returns and would result in returns which were materially false for any of the reasons stated in Count 7 through 67 in the indictment, then the Government has met its burden of proof in this element of [the offense].

N.T. 11/15/00 at 70. Defendants contend that this instruction constituted plain error, because the instruction suggested to the jury that it could convict on a § 7206(2) charge based only on the false W–2 evidence.[25] Defendants claim that in this case, because the fraudulent document involved was a W–2, the ordinarily standard instruction was erroneous. Defen-

a false return to be a 'foreseeable tax consequence' is just too fine for any jury to draw."

The Court notes that this section of *Goldberg* pertained to the § 371 conspiracy charge in that case, and was aimed at distinguishing between a Klein defraud conspiracy and a tax evasion charge under the Internal Revenue Code. The Court does not agree that the instruction referred to here, which was very clearly given in the context of the § 7206(2) charges only, presents that kind of

dants' objection is based on the relationship between § 7204 and § 7206(2), which is discussed at length above. As the Court observed throughout the trial, in a § 7206(2) case involving false W–2s, there needs to be additional action aside from the false W–2s to establish a violation of § 7206(2).

 In the absence of an objection, the Court examines the charge for plain error.[26] *United States v. Santos,* 932 F.2d 244, 251 (3d Cir.1991); *United States v. Benedetto,* 558 F.2d 171, 176 (3d Cir.1977). Plain errors are those that "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *United States v. Young,* 470 U.S. 1, 16, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). "[I]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977). The Court must review the instructions not "in artificial isolation, but . . . in the context of the overall charge." *United States v. Park,* 421 U.S. 658, 674, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975) (quotations omitted).

The Court concludes that, in context, the jury instruction at issue was not plainly erroneous. That portion of the instructions very clearly discussed only a portion of the proof necessary to establish a § 7206(2) charge. The Court very explicitly and repeatedly instructed the jury that in order to establish the charge, the Government needed to establish that the Defendants did more than simply provide a false W–2. In the context of the entire charge on the substantive law for the § 7206(2) charge, the instruction was not erroneous. Prior to that section of the

charge, the Court instructed the jury as follows:

Okay. Now let's focus on aiding and abetting. What is it, what can it be? Where should your focus be with respect to whether there has been aiding and abetting?

First let me state that it is not enough, it is not enough for the Government to establish only that the individual taxpayers listed in Count[s] 7 through 67 received a Form W–2 that did not include all of their income. That's not enough to make the charge. If that's all there is, it's not enough to make the charge. In order for the Government to establish that Anthony Gambone or John Gambone aided or abetted those individuals in filing a false return, you must find first that the return they filed was indeed false. Secondly, that the individual taxpayer in fact had income from Gambone Brothers that was not reported on this tax return; thirdly that the failure to report was the cause of the unlawful assistance of the defendant; and fourthly, that besides giving the taxpayer an incorrect Form W–2, Anthony or John Gambone did something else to aid that particular taxpayer in filing false return, besides [providing] an incorrect Form W–2 or transmitting an incorrect Form W–2.

And as to each taxpayer, members of the jury, you must affirmatively decide that the Government has proven beyond a reasonable doubt that the defendant did something to aid and assist that taxpayer besides simply and only providing an incorrect W–2 form. And you have heard all of the evidence with respect to everything that was going on. You don't have to determine what was

error. To the extent Defendants rely on this argument in establishing plain error, their reliance is misplaced.

**26.** Defendants acknowledge that they did not object to this part of the charge. John Gam-

bone, Sr.'s Reply Memo. at 12; *see* N.T. 11/17/00 at 82–84.

going on, and then determine whether there was aiding and assisting under the definition as I've just given it to you. N.T. 11/15/00 at 68–69. The Court concludes that the instructions as a whole made clear to the jury that in order to convict on the aiding and assisting counts, the jury had to find, beyond a reasonable doubt, that the Defendants did more than simply provide false W–2 forms to its employees. The instructions were therefore not clearly erroneous, and Defendants are not entitled to a new trial on this ground.

B. *Prosecutorial error in closing statement*

■ Defendants next challenge the following statement made in closing rebuttal by the Prosecutor. She said:

And to think it's not just—Mr. Bergstrom [defense counsel] talks about two percent of $600,000—let's think about what else it is. It's all the money over all those other years. And again, they want to hide behind the fact that there's not a paper trail of cash. And they want to point their finger at Mr. Sylvester and they want to bring up that whole thing about the bonds. Well, you know, ladies and gentlemen, Judge Padova told you before Ms. Winters' opening that openings were about what the Government expected the evidence to show. *And you saw that throughout this trial, various objections were made and Judge Padova would rule on them as he saw fit and you saw that evidence was excluded. So, if there's things we've said we were going to prove that we*

*didn't, don't hold it against us. You heard the objections they made.*[27] N.T. 11/14/00 at 172–73.

■ In deciding whether the prosecution has improperly commented at trial, the court should look to the overall context of the statements in the trial record. *United States v. Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Improper prosecutorial comments may lead the jury to infer that the prosecutor knows undisclosed facts which she could not present to the jury. *See United States v. Walker,* 155 F.3d 180, 186 (3d Cir.1998). If the Court concludes that a comment was improper, the Court must then apply harmless error analysis. *United States v. Zehrbach,* 47 F.3d 1252, 1265 (3d Cir.1995). The standard applied by the court depends on whether the error was of constitutional proportions. *Id.* at 1265. If the error is constitutional, then the conviction can be upheld only if the error is harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). If the error does not involve a violation of a constitutional right, the conviction can be upheld so long as there is a "high probability" that the error did not contribute to the conviction. *United States v. Jannotti,* 729 F.2d 213, 219–20 (3d Cir.1984).

■ The Government's comments came in rebuttal, and were offered in response to the following observation by Defense counsel:[28]

So what he tries to tell you is some tales about savings bonds. And I'm going to

27. Counsel for Anthony Gambone objected. N.T. 11/14/00 at 173.

28. The Government contends that its comment was an attempt to "neutralize" the effect of this statement. Invited responses that are reasonable responses to improper attacks by defense counsel are generally not reversible error. *Young,* 470 U.S. at 12–13, 105 S.Ct. 1038. The Court disagrees with the

Government that its statement was an "invited response" for the simple reason that there was nothing improper about defense counsel's statement. Defense counsel's purpose was to point out the gap between what the Government said it would prove, and what the evidence at trial actually proved. Though it is true that the Government is not required to prove each and every allegation made in an

tell you this because part of me says stay away from it, Bergstrom, but part of me says you've got to know, because you heard it in the Government's opening argument. They came in front of you and argued to you, some three and a half weeks ago, that there's a million dollars in savings bonds. Well, guess what? There isn't a million dollars in bonds. They didn't show you a million dollars in bonds at all. They showed you some bonds that were purchased between June of '94 and July of 1995. My recollection tells me those bonds totalled about $65,000.

N.T. 11/14/00 at 151–52.

Defendants contend that the prosecutor's comment "made plain to the jury that the prosecution possessed all sorts of other evidence which it was prevented from introducing by the defendants' objections." Reply Mem. of John Gambone, Sr. at 21. However, the Prosecutor's comment did not ask the jury to rely upon outside evidence to prove an element of the crime. As she explained during oral argument, "What we were saying was openings, as you told the jury before they began, are predictions of what the evidence is going to show. And our prediction was wrong." Trans. 5/15/01 at 29.

Even assuming that the comment was construed by the jury to mean that the government had evidence that the jury should rely upon, the comment clearly was not so broad in context. The statement was made in the context of a specific discussion about the amount of bonds, and further that there were large amounts of cash. The prosecutor first directed the jury's attention to "all the money over those years." Then following her state-

indictment, pointing out such a deficiency is proper argument. Therefore, the doctrine of invited error is inapplicable in this case. *See United States v. Molina–Guevara*, 96 F.3d 698, 704 (3d Cir.1996).

ment in response to Defense counsel, she continued to discuss the existence of cash, noting that:

In addition, let's just talk—it's not just the money that they didn't report on their own taxes. Think about the literally millions of dollars in unreported income.... You go back and look at those performance bonus schedules and see what it is on $600,000. It's a lot of money.

N.T. 11/14/00 at 173. Ms. Hayes' comments in rebuttal lacked any specific reference to evidence, and, moreover, did not go so far as to ask the jury to rely upon it in finding particular elements of the crimes charged. They were thus different in character from improper comments in the cases cited by Defendants. *See, e.g., United States v. Wilson*, 135 F.3d 291, 298 (4th Cir.1998) (going outside of evidence and asserting several times that defendant had murdered a man when such fact had not been proved); *United States ex rel. Shaw v. De Robertis*, 755 F.2d 1279, 1281 (7th Cir.1985) (informing the jury that, "You're not going to get those police reports. They're hearsay evidence. You can't have them. If you had them, you would see the truth."); *United States v. Vaglica*, 720 F.2d 388, 393–94 (5th Cir.1983) ("The reason we didn't bring any evidence in one way or the other [regarding particular aspect of defendant's intent] is because the Federal Rules of Criminal Evidence prohibit us from bringing in any witness on that particular item.").

 Even assuming, however, that the prosecutor's comment was improper, the Court concludes that in the context of the entire proceeding, the error involved was harmless beyond a reasonable doubt.[29]

**29.** In this case, Defendants assert that the error was constitutional, because it infringed upon Defendants' Sixth Amendment right to confront witnesses. The Court will apply the

In order to overturn a conviction or sentence for improper prosecutorial comments during a summation, the defendant must demonstrate prejudice sufficient to show the comments deprived defendant of a fair trial or violated the reliability of the sentencing process. *Darden v. Wainwright*, 477 U.S. 168, 180–81, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (upholding death sentence despite the prosecutor's improper comments because of lack of prejudice). The Court looks to three factors to determine whether there is prejudice: the scope of the improper comments in the overall context of the trial; the effect of any curative instructions given; and the strength of the evidence against the defendant. *United States v. Mastrangelo*, 172 F.3d 288, 297 (3d Cir.1999). The court views the statements, in the context of the entire proceeding, to determine if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) (upholding conviction despite improper remarks by the prosecutor as to the defendant's motivation to stand trial rather than plead)). Absent such a showing of unfairness and prejudice, prosecutorial misconduct alone does not require invalidation of a conviction or sentence. *See Smith v. Phillips*, 455 U.S. 209, 220, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

In this case, the comments were an isolated reference made once during the course of a four-week trial, thus distinguishing the comments from cases involving repeated improper remarks.[30] *See, e.g., Mastrangelo*, 172 F.3d at 296–98 (involving repeated misstatement and mischaracterization of stipulation relating to key element of offense, where Court's curative instruction also misstated the stipulation); *United States v. Murrah*, 888 F.2d 24, 28 (5th Cir.1989) (holding that repeated and pervasive remarks evaluating evidence, referring to witness who did not testify, and accusing opposing counsel of misconduct were designed to divert jury's attention from the charged offenses). In fact, the prosecution ended its rebuttal with the following statement:

> It is not an easy thing to do to say that someone is guilty. But if you find that the evidence proves beyond a reasonable doubt, that is what you have sworn to do. And as hard as it is, that's what you have to do. And all the Government wants you to do in this case. We don't want you to look on supposition. We don't want you to look on assumptions. We want you to look at the evidence that we presented. The documents and the witness testimony.

N.T. 11/14/00 at 185.

Moreover, the comments related to one relatively minor aspect of one portion of the conspiracy · scheme—the prong one cash skimming scheme.[31] The comment

---

more stringent "reasonable doubt" standard of *Chapman*, but notes that under either standard, its finding of harmless error would be the same.

**30.** Additionally, the Court instructed the jury, both in preliminary remarks prior to the start of the trial, and prior to deliberations at the conclusion of the trial, that the evidence in the case was limited to that presented in Court, and that argument by the attorneys, including opening and closing statements,

questions, and objections, were not evidence. These comments were far more extensive than the brief ones made by the prosecution.

**31.** In their briefs and at oral argument, counsel for all the Defendants contended that the comments were an open invitation to the jury to scour the Indictment for facts that were not proven at trial, and to fill in the gaps. Given the context of the comments in the entire rebuttal, the Court finds this interpretation improbable.

related to a discussion of the evidence of the proof of the purchase of bond amounts. At trial, the only direct evidence of these bond purchases related to a relatively short period, during which some $65,000 or so in bonds were purchased. However, Robert Sylvester, a government witness, testified to the practice of purchasing bonds, and to witnessing, on numerous occasions, John Gambone, Sr. handing envelopes of cash to his wife with instructions to purchase bonds. N.T. 11/1/00 at 156, 162. On one occasion, John Gambone asked Robert Sylvester to accompany Mrs. Gambone to the bank with $70,000 for the purpose of purchasing savings bonds. N.T. 11/1/00 at 163–64. Because the jury had more than sufficient evidence presented at trial upon which to base its prong one conviction, the error is harmless. *See Zehrbach,* 47 F.3d at 1267 ("[T]he extensive evidence of [defendants'] intent to defraud supports our conclusion that the prosecutor's remarks would not have prejudiced the jury's deliberations."). The case is thus distinguished from those in which the prosecutor's improper comment touched upon an issue that would have made a difference in the outcome of the case. *See, e.g., Mastrangelo,* 172 F.3d at 297 ("The prosecution sought to have the jury infer that [defendant] was the 'cook,' that is, the individual who actually turned the ingredients into methamphetamine, but it had no evidence, direct or indirect, of that fact."); *United States v. Molina–Guevara,* 96 F.3d 698, 705 (3d Cir.1996) (finding that prosecutor's repeated improper statements regarding credibility of two government agents was not harmless error where resolution of crucial issue rested on whether jury believed the defendant or the agents).

Furthermore, construed in its broadest sense, the comments do not go beyond prong one of the conspiracy, in which Defendants John Gambone, Sr. and Anthony Gambone were charged. In this case, the jury convicted Defendants on all three prongs of the conspiracy.[32] Even assuming that the prong one conviction would be properly vacated, the jury need only have convicted Defendants on one other prong of the conspiracy. In this case, the jury's convictions based on prongs two and three of the conspiracy would negate the need for a conviction on prong one as well.

### C. *Error for Admitting Portions of Tape Recording*

Defendant Anthony Gambone also moves for a new trial on the basis that the trial court erred by admitting portions of the March 11, 1998 tape recorded conversation between Defendant Anthony Gambone and Defendant John Zangari, a former Gambone Brothers employee and a cooperating government witness. Trial counsel for Anthony Gambone moved in limine to exclude the tape recording. Doc. No. 93. The Court denied the motion to exclude the entire tape, pursuant to Federal Rule of Evidence 801(d)(2)(A). N.T. 10/25/00 at 8, 15; Doc. No. 177. The Court excluded certain portions of the tape that referred to other bad acts or issues relating to legal counsel. N.T. 10/30/00 at 89–91, 106–11; N.T. 10/31/00 at 4–15. Co-Defendants John Gambone, Sr., William Murdoch, and Robert Carl Meixner also moved to preclude the tape against them. Doc. No. 97. The Court granted the Motion. Doc. No. 177. After the tape was played at trial, trial counsel moved to strike the tape and for mistrial. N.T.

---

**32.** The convictions of Defendants Murdoch and Meixner on the prong two conspiracy, as well as the substantive convictions of Defendants John and Anthony Gambone on the aiding and assisting counts, demonstrate that the jury concluded that prong two and prong three of the conspiracy existed.

10/31/00 at 121. The Court denied both motions. N.T. 10/31/00 at 123–24.

Defendant Anthony Gambone moves for a new trial on the basis that the admission of the tape into evidence was reversible error because: (1) the tape does not constitute admissions, and (2) even if so, it should have been excluded under Rule 403. The Court disagrees on both grounds.

■ Defendant first contends that the admission of the audio tape was erroneous because the statements were not admissions. The Court disagrees, and concludes that the evidence was properly admitted pursuant to Federal Rule of Evidence 801(d)(2)(A). The portions of the tape that were admitted constituted admissions by Anthony Gambone of knowledge and participation in the fraudulent payment scheme, and included apparent attempts to cover up those activities by encouraging Zangari not to talk. For example:

> Anthony Gambone: They'll put us all in jail. Now who told you that? Look here's, here's what you have to do, just use your head. *Number one ... it's all over the money that we paid without no taxes.*
>
> John Zangari: What, what am I supposed to do?
>
> Anthony Gambone: Wait a minute, slow down. You get the lawyers, we'll, we'll, we'll, just, just don't do no talking to 'em that's all. You don't talk to them. Understand? ...

Gov't Ex. 66 ("Audio Tape Trans.") at 2 (emphasis added).

\* \* \* \* \* \*

> Anthony Gambone: Wait a minute, would you just shut the [blank] up a minute. You think I'm trying to hurt you. I can't hurt you. I can't hurt you for Christsake. What's the matter with you?
>
> John Zangari: You can't you already did by the way you paid me. I'm hurt.

How, how do I get around that Tony? How do I get around the taxes? They said I'm going to have to pay on all the money that I was paid!

> Anthony Gambone: Slow down, slow the [blank] down will you. Jesus Christ you're acting like you're the only guy that got the, got the, the letter.
>
> John Zangari: They scared me to death. I just got done talkin' to them!
>
> Anthony Gambone: Slow down. Well what are you going to do? You never got, you never got involved in anything like this?
>
> John Zangari: [Blank] no!
>
> Anthony Gambone: John, it all boils down to this, there's no [blank] two ways about it. You turn around, we'll have, we'll get you a good attorney.

Audio Tape Trans. at 5.

\* \* \* \* \* \*

> John Zangari: I'm going, I have, I'm going to my own attorney as soon as I leave here.
>
> Anthony Gambone: Just slow down.
>
> John Zangari: To see what I should do.
>
> Anthony Gambone: *The only thing you shouldn't do is try to hurt me.*

Audio Tape Trans. at 6 (emphasis added).

\* \* \* \* \* \*

> Anthony Gambone: Did I ever tell you to go out and do something to deliberately hurt, hurt me or hurt the government?
>
> John Zangari: *Tony when I came to work for you, you paid that way. We had no choice. Remember, um what's his name that one guy? That one laborer, Bobby Eickholt or whatever his name was, came in, he did not want to work this way. You told me fire him, if he don't want to work and pay the taxes fire him, if he don't want to work the way you pay. I, what, well suppose this*

guy talks? What am I supposed to say, I never had the conversation with him?

Anthony Gambone: *Yeah but what I'm saying . . .*

Audio Tape Trans. at 7 (emphasis added).

John Zangari: I'm going to, I uh have a real good friend attorney that's, I did work for him. He's a criminal friend attorney that's, I did work for him. He's a criminal lawyer. I'm going to talk to him today to see what I should do.

Anthony Gambone: If you want to use you head the right way *because whatever you do to try to hurt me or try to hurt youse, you'll hurt yourself too.*

Audio Tape Trans. at 8 (emphasis added).

\* \* \* \* \* \*

John Zangari: *I never got no 1020s or whatever the [blank] they are.*

Anthony Gambone: *No, no that's one of the things we did wrong.*

Audio Tape Trans. at 18 (emphasis added).

\* \* \* \* \* \*

Anthony Gambone: Let me say this, get, that's fine you can have him, but you got to have a good IRS attorney with it. Alright, understand what I'm saying? *If you're going to be on our team, and then, keep it on the team. So you save your ass and save everybody else's ass . . . .*

\* \* \* \* \* \*

Anthony Gambone: Let me tell you something, nobody's going to jail if you use your [blank] head. *If you don't use your head then maybe everybody goes to jail. Now, the only thing I'm saying to you is all you gotta do is not be a panic and don't talk to nobody, number one.* Don't talk to a [blank] soul, alright, see my attorney, alright.

Audio Tape Trans. at 19 (emphasis added).

\* \* \* \* \* \*

John Zangari: *Tony when I came to work for you for the taxes, I had no*

choice, this is the way you paid. This is what it's about.

Anthony Gambone: *My whole theory was we paid more per hour than the person was worth.*

Audio Tape Trans. at 20 (emphasis added).

Anthony Gambone: What they're gonna do, they'll say now we'll give you plenty of this you just rat on everybody else and do everything you can do and you got nothing to worry about. They'll, they'll probably do that to you, you know. You don't have to rat on everybody, you · don't have to do anything wrong to, to get everything cleaned up.

Audio Tape Trans. at 21.

Anthony Gambone: Alright. Slow down. Go to work for an hour or so two hours. Running to your attorney, the way you are now, you're not worth five cents, you understand? *You even got to watch what you tell them because they'll go make a deal and act like you're mister hero, because for you to get hurt and me to get hurt, you gain nothing, for me to get hurt, you gain nothing. You understand?*

Audio Tape Trans. at 23 (emphasis added). The Court concludes that the portions of the tape that were admitted were properly admitted under the Federal Rules of Evidence. ·

Defendant alternatively suggests that the probative value of the tape is greatly outweighed by prejudice. Federal Rule of Evidence 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403. The Court disagrees. Defendant's admissions on the tape were

probative of his knowledge and participation in the conspiracy charged in the indictment. Defendant has failed to demonstrate sufficient prejudice to outweigh the probative value of that evidence. In moving to strike the tape after it was played, trial counsel posited that the tape has "a lot of cursing and swearing, and it just makes things look bad, but there is no substance to it, ..." N.T. 10/31/00 at 122. The Court concludes that the probative value outweighed this rather minimal danger of prejudice.[33] Therefore, Defendant's motion for a new trial is denied.

### D. *Error for Admitting IRS Forms– 1099 as Business Records*

■ Defendant Anthony Gambone moves for a new trial based on erroneous admission of the Forms 1099 as business records. Defendant claims that the forms do not fall under the 803(6) rule as business records. Federal Rule of Evidence 803(6) provides:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, ... unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Fed.R.Evid. 803(6).

Defendants claims that the testimony of Agents May, Linder, and Patella regarding the 1099s was insufficient to establish that the records fit the business records exception. Specifically, Defendants contend that the documents were not prepared "contemporaneously" and in the "ordinary course of business."

However, Exhibit 86 consisting of a file of forms 1099, was admitted without objection following the testimony of Julia Tamaki, who actually prepared the forms. N.T. 10/27/00 at 103–05, 123. Tamaki prepared the forms at the direction of Thomas Gaasche, the controller of Gambone Brothers. N.T. 11/2/00 at 102. The documents in the exhibit were clearly created by employees of the Gambone Brothers as part of the negotiated settlement with the Internal Revenue Service and in relation to the regularly conducted business activity of the company. They were created by individuals with knowledge, and were kept in the regular files of the company. The particular employee involved in creating the 1099 forms, in fact, was the same employee who was responsible for creating the 1099s each year. N.T. 10/27/00 at 98–102. The Court concludes that the 1099s were properly admitted as nonhearsay evidence fitting the business records exception. *See* Fed.R.Evid. 803(6). Defendants' Motion for new trial is therefore denied.

## V. Conclusion

The Court grants judgment of acquittal for Defendant Robert Carl Meixner on Count 1. The Court also grants judgment of acquittal on Counts 2, 3 and 4. The Court denies all of the other motions for judgment of acquittal and denies all mo-

---

33. The Court concludes that the case relied on by Defendant, *United States v. Sriyuth*, 98 F.3d 739 (3d Cir.1996), is inapposite. In *Sriyuth*, which involved charges of kidnapping, the district court admitted evidence of a prior rape of a nine-year old boy under Federal Rule of Evidence 404(b). Because of the facts involved in *Sriyuth*, the danger of prejudice was far more extreme and real. In any case, the Third Circuit upheld the admissibility of the evidence under Rules 404(b) and 403. *Sriyuth*, 98 F.3d at 746.

tions for a new trial. An appropriate Order follows.