

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-3-2003

# USA v. Gambone

Precedential or Non-Precedential: Precedential

Docket 01-4424

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"USA v. Gambone" (2003). *2003 Decisions.* Paper 830.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/830

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed January 3, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 01-4424 and 01-4427

UNITED STATES OF AMERICA

v.

JOHN A. GAMBONE, SR.
a/k/a JACK

John A. Gambone, Sr.,
        Appellant in No. 01-4424

UNITED STATES OF AMERICA

v.

ANTHONY GAMBONE
a/k/a TONY

Anthony Gambone,
        Appellant in No. 01-4427

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Crim. Nos. 00-00176-1 and 00-00176-2)
District Judge: Honorable John R. Padova

Argued October 17, 2002

Before: ROTH and GREENBERG, Circuit Judges,
and WARD, District Judge*

_____

* Honorable Robert J. Ward, Senior Judge of the United States District
Court for the Southern District of New York, sitting by designation.

(Filed: January 3, 2003)

        Patrick L. Meehan
        United States Attorney
        Robert M. Falin (argued)
        Assistant United States Attorney
        Laurie Magid
        Deputy United States Attorney for
        Policy and Appeals
        Robert A. Zauzmer
        Assistant United States Attorney
        Senior Appellate Counsel
        Kristin R. Hays
        Assistant United States Attorney

615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

Attorneys for Appellee

Donald J. Goldberg (argued)
Eric W. Sitarchuk
Meredith S. Auten
Ballard, Spahr, Andrews & Ingersoll
1735 Market Street, 51st Floor
Philadelphia, PA 19103

Attorneys for Appellant John A.
Gambone, Sr.

Thomas A. Bergstrom
138 Davis Road
Malvern, PA 19355

Attorney for Appellant Anthony
Gambone

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. FACTUAL AND PROCEDURAL HISTORY

This matter comes on before this court on appeals from judgments of conviction and sentence entered in the district

2

court on December 13, 2001. Defendants-appellants, John A. Gambone, Sr. ("Jack") and Anthony Gambone ("Tony"), are brothers who owned and operated a construction business, known since 1983 as Gambone Brothers Organization, Inc. ("Gambone Brothers"). The indictment accused them of engaging in a three-part scheme over the course of 20 years, the purpose of which was to file false personal income tax returns and to aid and assist certain of their employees and subcontractors in doing the same. Although there are other Gambone defendants in this case, we sometimes refer to Jack and Tony exclusively as the Gambones as they are the only appellants.

The first prong of the conspiracy, called the "cash-skimming" prong in the indictment, involved a systematic plan to receive payment from home purchasers for certain "extras" in cash, not to record those payments on Gambone Brothers' books, and to hide this additional income from the IRS by buying United States savings bonds or simply by holding the cash in a safe or a nightstand.1

Prong two of the conspiracy, called the "overtime/expense reimbursement/ 'off-payroll' fraud" prong in the indictment, charged that the Gambones used three methods to avoid reporting to the IRS significant wages paid to their employees with the intention that the employees would do

the same. The first and most common method was to pay
the employees "straight time" rather than time and one-half
for all work beyond 40 hours per week and to pay the
employees with two separate checks, one for 40 hours paid
from a payroll account and a second for overtime paid from
a nonpayroll account.[2] The purpose of this scheme was to
avoid the requirements of the Fair Labor Standards Act and
to avoid paying the employer's share of Social Security and
Medicare ("FICA") taxes by not reporting the overtime wages
to the IRS and by not withholding income or FICA taxes.

---

1. We point out that even though it might seem strange that a person
would buy United States savings bonds with unreported income, the
Gambones did so as the income from such bonds need not be reported
to the IRS until they are cashed or mature.

2. At least at certain times Gambone Brothers used an outside payroll
service to pay straight time wages.

3

The indictment also alleged that the Gambones, either
themselves or through their personnel employees, informed
new employees that Gambone Brothers would not report
overtime wages and encouraged those employees to do the
same. The second method used to avoid reporting wages
involved disguising certain employees' raises as expense
reimbursements, which are not reported as income. The
third method involved paying some employees partially or
completely "off-payroll," that is, paying them from
nonpayroll, operating accounts rather than from payroll
accounts.

To conceal all three types of payments the Gambones had
their finance department prepare and file numerous
fraudulent tax documents, including false W-2 forms to be
attached to employees' personal income tax returns
reporting regular wages but failing to report overtime
wages, expense reimbursements, and off-payroll wages. The
government estimated that the Gambones aided and
assisted their employees in failing to report at least $4.5
million in overtime wages and hundreds of thousands of
dollars in wages disguised as expense reimbursement and
off-payroll payments.

The third prong of the conspiracy, called the "unreported
subcontractor payments" prong in the indictment, charged
that the Gambones failed to issue and file IRS forms 1099
for millions of dollars worth of services rendered by
subcontractors. In doing so, the Gambones aided and
assisted some subcontractors in failing to report
substantial income.

A grand jury returned a 67-count indictment against the
Gambones and their co-defendants, Sandra Lee Gambone
("Sandy"), William Murdock, John Gambone, Jr. ("Johnny"),
and Robert Carl Meixner on April 6, 2000. In particular
Count One charged all defendants with the conspiracy to

defraud the United States as outlined above, in violation of 18 U.S.C. S 371. Murdock and Meixner were implicated, however, only in the second prong of the conspiracy. Count Two charged Jack and Sandy, who are married, with the substantive offense of subscribing to their own false 1994 tax return, in violation of 26 U.S.C. S 7206(1). Count Three against Tony, Count Four against Murdock, Count Five

4

against Johnny, and Count Six against Meixner similarly charged each individual with subscribing to a false personal tax return for either the 1993 calendar year (Johnny, Murdock, and Meixner) or the 1994 calendar year (Tony). Counts Seven through Sixty-Seven charged Jack and Tony with aiding and assisting in the preparation of false individual income tax returns for 61 employees, in violation of 26 U.S.C. S 7206(2).

After the district court granted Sandy and Johnny a severance, the case was tried against the other four defendants.3 At the trial each of the defendants moved for a judgment of acquittal on all counts against them pursuant to Fed. R. Crim. P. 29(a) but the district court reserved judgment on these motions pursuant to Fed. R. Crim. P. 29(b). On November 17, 2000, the jury returned guilty verdicts on all counts against the Gambones except for counts Forty-Three and Fifty-Seven. In addition, it found Murdock guilty on Counts One and Four and Meixner guilty on Counts One and Six. Thus, the jury found all defendants guilty on all counts except that it found the Gambones not guilty of aiding and assisting two of the 61 employees in preparing false individual returns.

Following the jury verdicts, each defendant renewed his motion for a judgment of acquittal and, in the alternative, moved for a new trial. On September 4, 2001, the district court granted Jack's motion for judgment of acquittal on Count Two, Tony's motion for judgment of acquittal on Count Three, Murdock's motion for judgment of acquittal on Count Four, and Meixner's Motion for Judgment of Acquittal on Count One.4 The court denied all the defendants' motions on all other counts. See United States v. Gambone, 167 F. Supp. 2d 803 (E.D. Pa. 2001). All defendants except Meixner therefore were acquitted of the

_____

3. The district court denied the defendants' pretrial motion to dismiss count one of the indictment. See United States v. Gambone, 125 F. Supp. 2d 128 (E.D. Pa. 2000).

4. Although the September 4 order accompanying the court's opinion mistakenly granted Murdock's motion as to Count Three, in which he was not charged, that error was corrected by order of September 6, 2001.

5

substantive offense of filing a false individual tax return in either 1993 or 1994 but the court did not disturb any of the convictions on the conspiracy count except Meixner's and did not disturb the Gambones' convictions on 59 counts of aiding and assisting in the preparation of false individual tax returns. Moreover, the court denied the defendants' motions for a new trial. The court subsequently sentenced the Gambones to custodial terms of 37 months on Count One and custodial terms of 36 months on all other counts, all terms to run concurrently, ordered them to pay fines of $75,000 and to pay the IRS $3,000,000. In addition, the court imposed terms of supervised release upon the Gambones' completion of their custodial terms and ordered them to pay certain costs of the prosecution. They then appealed.[5] We have jurisdiction under 28 U.S.C. S 1291.

## II. DISCUSSION

### A. Sufficiency of the Evidence

#### 1. Standard of Review

We review the "sufficiency of the evidence . . . in a light most favorable to the Government following a jury verdict in its favor." United States v. Antico, 275 F.3d 245, 260 (3d Cir. 2001) (citing Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469 (1942)). "We must sustain the verdict if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision. . . . We do not weigh evidence or determine the credibility of witnesses in making this determination." United States v. Beckett, 208 F.3d 140, 151 (3d Cir. 2000) (citations omitted). In making our review we examine the totality of the evidence, both direct and circumstantial. See Antico, 275 F.3d at 260. We must credit all available inferences in favor of the government. See United States v. Riddick, 156

_____

5. According to the Gambones' brief, Murdock and Meixner did not appeal and, as of the time of the filing of the Gambones' brief on this appeal, the case against Sandy and Johnny had not been tried. The Gambones challenge only their convictions and not their sentences on this appeal.

6

F.3d 505, 509 (3d Cir. 1998). Our review of the district court's interpretation of a statute is plenary. See United States v. DeJulius, 121 F.3d 891, 893 (3d Cir. 1997).

#### 2. Aiding and Assisting Convictions

We first address the Gambones' convictions for aiding and assisting their employees in the preparation of false individual income tax returns in violation of I.R.C. S 7206(2). Section 7206(2) provides:

        Any person who

. . .

> (1) [w]illfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document . . .

> shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.

The Gambones advance a two-part argument challenging their convictions under section 7206(2). The first step in their reasoning raises a purely legal question. Casting their conduct as, at most, a scheme to provide false W-2s, they argue that the Internal Revenue Code allowed the government to prosecute them only under I.R.C. S 7204. Section 7204 sets forth a misdemeanor offense for willful furnishing of a false W-2 to an employee as follows:

> In lieu of any other penalty provided by law (except the penalty provided by section 6674) any person required under the provisions of section 6051 [governing an employer's obligation to issue, inter alia, W-2 forms to employees] to furnish a statement who willfully furnishes a false or fraudulent statement or who willfully fails to furnish a statement in the manner, at

7

> the time, and showing the information required under section 6051, or regulations prescribed thereunder, shall, for each such offense, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both.

The Gambones argue that this provision's "in lieu of" language indicates that section 7204 provides the exclusive penalty for willfully furnishing a false W-2 to an employee. They further note that the three-year statute of limitations for prosecutions under section 7204 had expired by the time the government initiated its case under section 7206(2).

The Gambones then argue that inasmuch as the government may prosecute a defendant for the willful furnishing of a false W-2 to an employee only under section 7204, the evidence was insufficient to sustain a conviction under section 7206(2) as that section requires proof of conduct beyond the mere furnishing of false W-2s. They contend that they did not take affirmative action with respect to their employees' false tax returns beyond

furnishing the false W-2s, and that the jury could not appropriately consider the furnishing of those W-2s or other conduct facilitating it, such as paying money off payroll and underreporting on employee time cards, in connection with the section 7206(2) charges. The Gambones argue that if we remove this evidence from the equation there will not be an evidentiary basis for their section 7206(2) convictions.

### a. Exclusivity of section 7204

As the district court noted, this case presents an issue of first impression in this court as we have not interpreted explicitly the "in lieu of" language of section 7204, and we have not had the occasion to discuss the relationship between sections 7204 and 7206(2). See Gambone , 167 F. Supp. 2d at 820. The district court, relying primarily on United States v. Hughes, Crim. A. No. CR 86-98, 1987 WL 33806 (N.D. Ohio Nov. 13, 1987), held that "conduct which involves, but is not exclusively limited to, the provision of false W-2s can be sufficient for a S 7206(2) violation. Thus,

the mere fact that the provision of false W-2s was a part of the case does not mean that a S 7206(2) violation is not possible." Gambone 167 F. Supp. 2d at 820. The court thus rejected the Gambones' contention that it should disregard entirely the furnishing of the W-2s in assessing the sufficiency of the evidence supporting the section 7206(2) convictions. Nonetheless, when moving on to examine the sufficiency of the evidence, the court found that the evidence was sufficient to sustain the section 7206(2) verdicts "even excluding consideration of the W-2s themselves." Id. at 821.

In Hughes, the district court concluded that"the simple fact of providing, or helping to provide, an individual with a fraudulent W-2 is not punishable under S 7206(2) because of S 7204's 'in lieu of' provisions." Hughes, 1987 WL 33806, at *4. The court found, however, that"[a]s long as there are other actions violative of S 7206, the fact that the defendant may also have provided an individual with a false W-2 does not prevent a S 7206 conviction." Id. (citing United States v. MacKenzie, 777 F.2d 811 (2d Cir. 1985); United States v. Isaksson, 744 F.2d 574 (7th Cir. 1984); United States v. Barnes, 313 F.2d 325 (6th Cir. 1963)). Having so concluded, the court denied the defendant's motion for judgment of acquittal or for a new trial, finding that, "[b]ased on the evidence presented, the jury could have found beyond a reasonable doubt that [the defendant] additionally counseled [an employee] to understate her income on her income tax return, by reporting as income only that amount shown on the W-2 and not the additional income which she received as 'expenses.' " Id. In other words, the defendant violated section 7206(2) by going beyond merely providing false W-2s and, in fact, counseling an employee to understate income.

The defendant appealed and the Court of Appeals for the Sixth Circuit reversed even though it did not find that the district court erred in its legal analysis. Rather, the court of appeals held that there was insufficient evidence that the defendant counseled the employee to understate her income, noting that the employee had denied receiving such advice. Hughes v. United States, 899 F.2d 1495, 1500-01 (6th Cir. 1990). The court of appeals did not clarify whether

section 7206(2) requires proof of actual counseling or whether something more than furnishing false W-2s but less than actual counseling would support a conviction.6

Our cases have not been more helpful with respect to the issue here than that of the court of appeals in Hughes. In a case not involving furnishing of false W-2s, we held that "[t]o establish aiding and abetting the filing of a false tax return 'there must exist some affirmative participation which at least encourages the perpetrator.' " United States v. Graham, 758 F.2d 879, 885 (3d Cir. 1985) (quoting United States v. Buttorff, 572 F.2d 619, 623 (8th Cir. 1978) (internal quotation omitted)). In Graham, we held that there was sufficient evidence to affirm a defendant's conviction where the defendant, who was a member of a group that opposed taxation, set up a Swiss bank account for another member and advised him not to pay taxes on the interest earned on that account "because the U.S. had no jurisdiction over it." Id. Likewise, where a defendant had provided false invoices to certain taxpayers as documentation of business expenses and advised those taxpayers to use those expenses as tax deductions improperly, we found sufficient evidence to sustain his conviction under section 7206(2). United States v. McCrane, 527 F.2d 906, 913 (3d Cir. 1975), vacated on other grounds, 427 U.S. 909, 96 S.Ct. 3197 (1976).

Finally, other courts of appeals, in cases involving similar factual scenarios where defendant employers disguised certain wages by issuing paychecks from nonpayroll accounts, have affirmed convictions under section 7206(2) where the defendants' conduct included, but apparently was not limited to, furnishing false W-2s. See, e.g., MacKenzie, 777 F.2d at 820; Isaksson, 744 F.2d at 577-78. These courts, however, did not address specifically the relationship between sections 7204 and 7206(2).

The legislative history of section 7204, cited by both sides, clearly establishes that Congress intended the "in lieu of" language to ensure that the section 7204 penalties displaced the more severe penalties in other provisions of

---

6. The court of appeals affirmed in part and reversed in part on other aspects of the appeal that we need not describe.

the Internal Revenue Code setting out both felonies and
misdemeanors. H.R. Rep. No. 2333, 77th Cong., 2d Sess. at
132 (1942); S. Rep. No. 1631, 77th Cong., 2d Sess. at 172
(1942) ("These penalties are prescribed in lieu of the penalty
imposed by S 145 of the Code, and are much less severe
than those displaced."). Beyond this point, which, in any
event, the "in lieu of" phrasing of section 7204 itself
adequately captures, the parties' citations to section 7204's
legislative history are largely inconclusive, inasmuch as
that history fails to address its relationship to section
7206(2).

On the other hand, the timeline of amendments to the
Code does lend some support to the government's position
that evidence of the Gambones' furnishing of false W-2s can
be used to support the section 7206(2) convictions.
Congress enacted section 7204 as I.R.C. S 470(a) in 1942.
Revenue Act of 1942, Pub. L. No. 77-753, 56 Stat. 798, 892.7
At that time section 7206(2) already was in place in the
form of I.R.C. S 3793(b) in the Internal Revenue Code of
1939, Congress having enacted it in 1924. See  Revenue Act
of 1924, 26 U.S.C. S 1267 (1926). Conduct designed to
assist an employee in filing a false return therefore already
was punishable under section 3793(b), while failing to
furnish a statement required under the Code (although not
specifically applicable to the W-2 context, inasmuch as
employers were not yet required to withhold) was
punishable under I.R.C. S 145(a). Taking the legislative
history at its word, section 470(a), enacted as part of the
new withholding regime, was intended to displace the
penalties under section 145, which set out misdemeanors
in subsection (a), including for failing to furnish a
statement, and felonies in subsection (b). There is no

---

7. Congress first required employers to withhold employees' income taxes
in 1942; the 5% World War II "Victory Tax" on most employees' gross
wages was the first vehicle for doing so. Carolyn C. Jones, Class Tax to
Mass Tax: The Role of Propaganda in the Expansion of the Income Tax
During World War II, 37 Buff. L. Rev. 685, 694-99 (1989); Peter W. Colby,
Comment, Federal Withholding on Employee Fringe Benefits for Income
and Social Security Taxes, 70 Cal. L. Rev. 178, 180-81 & n.19 (1982).
The following year, Congress amended the Code to make withholding
applicable to all income tax. Id.

indication, however, that Congress intended section 470(a),
now section 7204, to displace the penalty under section
3793(b). The legislative history therefore lends some
support to the government's argument that Congress did
not intend section 7204 to preclude felony prosecutions of
conduct involving, but not limited to, furnishing false
statements.

Moreover, nothing in the language of either section 7204
or section 7206(2) or in the relevant legislative history,
suggests that a jury may not consider the furnishing of

false W-2s in deciding whether a defendant committed an offense under section 7206(2). Read together, these provisions stand for the less than remarkable proposition that a person who merely furnishes false W-2s is only culpable enough to deserve a misdemeanor conviction, while a person who goes further and willfully causes a false return to be filed is more culpable and is guilty of a felony. Thus, although the "in lieu of" language suggests that proof of the mere furnishing of false W-2s is insufficient as a matter of law to support a section 7206(2) conviction,[8] such evidence plus any other evidence suggesting a defendant's intent to cause a false return to be filed form a proper evidentiary basis for such a conviction. Indeed, MacKenzie and Isaksson implicitly applied this principle.

Thus, the government may prosecute conduct involving, but not limited to, furnishing false W-2s to employees under section 7206(2). Under Graham, the relevant inquiry is whether the defendant engages in "some affirmative participation which at least encourages" the employee to prepare or present a false return. Graham, 758 F.2d at 885. Evidence of such affirmative participation that includes, but is not limited to, furnishing false W-2s is sufficient to sustain a conviction under that provision.[9] Finally, such

_____

8. Allowing the jury to infer intent to aid and assist from the mere furnishing of false W-2s would subject a defendant who had engaged in precisely the conduct prohibited by section 7204--no more and no less-- to a punishment other than that prescribed by that section, thus ignoring the "in lieu of" language.

9. The Gambones also argue that other conduct ancillary to furnishing false W-2s--details such as the preparation of employee time cards, the

12

affirmative participation need not rise to the level of actual counseling, as the Gambones sometimes seem to suggest, as long as it "at least encourages" the preparation or presentation of a false return.

  b. Sufficiency of the Evidence

Given the foregoing framework, the government presented sufficient evidence to sustain the 59 section 7206(2) aiding and assisting convictions. To be sure, there was no direct evidence that either of the Gambones explicitly counseled any of the 59 employees to underreport their income. There was, however, ample circumstantial evidence to allow the jury to conclude that the Gambones aided and assisted them in doing so by encouraging exactly that behavior.

The essential elements of an offense under section 7206(2) are (1) that defendant aided, assisted, procured, counseled, advised or caused the preparation and presentation of a return; (2) that the return was fraudulent or false as to a material matter; and (3) that the act of the defendant was willful. I.R.C. S 7206(2). See United States v.

La Haye, 548 F.2d 474, 475 (3d Cir. 1977); see also United
States v. Hooks, 848 F.2d 785, 788-89 (7th Cir. 1988).

_____

use of separate, nonpayroll checks for overtime wages, and the extra
accounting necessary to accommodate a false W-2 scheme--should in
effect merge with the furnishing of false W-2s, so that evidence of such
conduct likewise would be insufficient on its own to sustain a section
7206(2) conviction. Because this position lacks any support in the
statutory text, legislative history, and applicable caselaw, we reject it. If
a defendant goes beyond merely furnishing false W-2s, and if the jury
finds his conduct to constitute affirmative participation that encourages
employees to file false returns, it may convict him of a felony under
section 7206(2). The Gambones suggest that, because"every
fraudulently understated W-2 opens the possibility" of such ancillary
conduct, in every section 7204 case the facts also would support a
section 7206(2) conviction. Joint Br. of Appellants at 26. Nevertheless we
are satisfied that persons who furnish false W-2s may avoid felony
convictions so long as they either eschew such ancillary conduct
altogether, or at least engage in such conduct in such a way that a jury
does not believe to constitute affirmative participation that willfully
encourages employees to file false returns.

13

There appears to be no dispute as to the falsity of the
employees' returns and as to the materiality of the false
statements. The Gambones challenge the sufficiency of the
evidence only on the issue of whether they aided or assisted
the filing of those returns and whether their actions were
willful. Through the testimony of two controllers of
Gambone Brothers, Frank Ruser, who worked in that
position from 1972 to 1981, and Thomas Gaasche, who was
controller from 1985 until April 2000, the government
established that there was a scheme to pay employees'
overtime wages from nonpayroll accounts, paying"straight
time," and failing to withhold tax from the overtime wages
and to disclose those wages to the IRS. Thus, when Ruser
expressed his concerns about how overtime was paid, Tony
Gambone responded, "It's my business, stay out of it." Id.
at 662. Similarly, Gaasche testified:

> I was probably only working there, you know, six to ten
> weeks when I--you know, looking at payroll, and I
> realized at that point everything going through payroll
> was just a flat 40 hours. And, you know, I thought it--
> I don't like this, this seemed improper to me. And I
> went to Jack Gambone and I went in his office and I
> said, Jack, I don't--I don't think we're handling payroll
> right, I don't know why we're doing this, why is it only
> showing 40 hours and then the other is on a separate
> check? And I don't recall verbatim what he said, but
> basically he said, well, this is their mad money, you
> know, they take one check home and the old lady don't
> have to know about the other one. And I said--at that
> time I said, well, I don't know why you'd stick your
> neck out for them and help them hide money from
> their wives. I said, you know, if it gets audited you're
> probably going to wind up paying both your share and

their share of the social security and Medicare taxes.

Id. at 1731-32.

Notwithstanding the controllers' concerns the practice persisted. In 1995 the IRS audited Gambone Brothers which then for a short time began paying overtime through payroll. After some time, however, Gaasche confronted Tony Gambone about what he suspected was a false expense reimbursement, and Gambone responded, "[I]t's my

14

company. I can pay whoever I want however I want and as much as I want." Id. at 1828. The government also produced the testimony of four employees who worked under the controllers in the accounting department, a receptionist who worked at Gambone Brothers for over 20 years, and 20 field workers and supervisors, all of whom testified that they received overtime wages off payroll. Moreover, the witnesses were aware that Gambone Brothers neither withheld tax from nor reported those wages, and they understood that they should not report those wages to the IRS either. Many witnesses also testified that Gambone Brothers gave employees who were to receive raises the option of having the money paid on or off payroll.

The Gambones suggest that the testimony of these 25 employees is insufficient to prove that they willfully aided or assisted the preparation of false returns because none of the employees testified that the Gambones directly counseled them to do so. As we discussed above, however, the government did not have to prove that the Gambones directly counseled employees to file false returns. Rather, it was sufficient for the government to demonstrate that they engaged in some affirmative conduct that at least encouraged them to do so. The Gambones contend that their role was limited to providing false W-2s and that they had no interest in whether or not the employees reported their overtime wages. The overwhelming weight of the evidence, however, establishes that this is not an accurate characterization of the Gambones' conduct. Given the testimony of all of the witnesses just mentioned, there plainly was sufficient circumstantial evidence to support a finding that the Gambones engaged in a long-running scheme to encourage their employees to file false returns. The Gambones not only furnished false W-2s to scores of employees, but also created false employee time cards, engaged in intricate and deceptive bookkeeping intended to mask underreported income, and issued checks to employees from nonpayroll accounts for unreported overtime wages.

The parade of employees testifying that they understood the Gambones' actions as a sign that they should not report their overtime wages is evidence in itself that the

15

Gambones, through this pervasive, ongoing scheme, took affirmative steps to encourage the employees to file false returns.10 Furthermore, some witnesses testified that agents of the Gambones, including John Zangari, a superintendent involved in hiring new employees, and certain foremen informed them more specifically that Gambone Brothers' "straight-time" policy meant that they should not worry about reporting overtime income. When pressed further, Zangari told these employees that Gambone Brothers would take care of any problems that might arise out of employees' failure to report overtime income. One employee testified Zangari told him that he should quit if he did not want to be paid under the "straight-time" system, and Zangari testified that when he told Jack and Tony Gambone about another employee's request that taxes be withheld from all of his pay, the Gambones told him the employee's only options were to receive a "straight-time" check, not to work overtime at all, or to quit. Finally, Zangari, who, from 1989 to 1993, was the company's "overall superintendent," overseeing all jobs performed during that time period, testified that he informed all newly hired employees up-front of the "straight-time" policy, and that he spoke daily with Tony Gambone, mentioning in their discussions every new employee hired.

Cumulatively, this evidence supports an inference that the Gambones, either themselves or through their agents, encouraged employees not to report overtime income. Employees were informed that Gambone Brothers would pay straight time for overtime, not report overtime income, and take care of any problems that might arise. As a result, some employees testified that they felt obligated not to report overtime income for fear of blowing the whistle on Gambone Brothers or on their fellow employees. The evidence supports the inference that the Gambones intended exactly that result, inasmuch as inconsistent reporting would have pointed to their own underreporting,

---

10. Curiously, the Gambones appear to concede that there was evidence supporting this inference. Joint Br. of Appellants at 26 ("There was also evidence enough to conclude that the Gambones intended to make it possible for their employees not to report all of their wage income by issuing false W-2s, and that some employees so understood it.").

16

which they had taken great pains to hide by creating false employee time cards and manipulating the company's books. In any event, although there was little evidence suggesting that the Gambones explicitly advised employees to file false returns, there is ample circumstantial evidence showing that they took affirmative steps to encourage them to do so. Accordingly, a reasonable jury could have concluded that the Gambones knowingly aided and assisted in the preparation of tax returns of 59 employees that contained materially false statements and, thus, the evidence supported the convictions for violations of section

7206(2).

3. Conspiracy Convictions

To sustain its burden of proof on the crime of conspiracy to defraud the United States, the government had to prove: (1) the existence of an agreement; (2) an overt act by one of the conspirators in furtherance of the objective; and (3) an intent on the part of the conspirators to agree as well as to defraud the United States. See United States v. Rankin, 870 F.2d 109, 113 (3d Cir. 1989) (citing United States v. Shoup, 608 F.2d 950, 956 (3d Cir. 1979)). The indictment described three ways in which the Gambones conspired to defraud the United States by: skimming cash from Gambone Brothers and failing to report it as income on their own personal returns; paying and not reporting employee income from overtime wages and aiding and assisting those employees in filing false returns; and not reporting payments to subcontractors and therefore aiding and assisting those subcontractors in their failure to report that income.

We will affirm the convictions as long as we find that there was sufficient evidence with respect to one of the three alleged prongs of the conspiracy. See United States v. Syme, 276 F.3d 131, 144 (3d Cir. 2002) (citing Griffin v. United States, 502 U.S. 46, 49-50, 112 S.Ct. 466, 469-70 (1991)). The evidence discussed above with respect to the substantive convictions under section 7206(2) also supports convictions under the second prong of the conspiracy count. In particular, that evidence allowed a jury to conclude that the Gambones (1) had an agreement, the purposes of which were to avoid paying their share of

17

social security and Medicare taxes and to encourage employees to go along with the scheme by filing false tax returns, (2) committed a number of overt acts in furtherance of those objectives by furnishing false W-2s, falsifying employee timecards, paying overtime wages off-payroll, and engaging in deceptive bookkeeping, and (3) intended both to agree to defraud and to defraud the United States. There was therefore sufficient evidence to sustain the conspiracy convictions.

The evidence was sufficient to sustain convictions for the cash skimming conspiracy as well. Gaasche testified that Gambone Brothers received payments predominantly by check, and that the largest of the infrequent cash payments he recalled seeing when he was controller was approximately $3300. Three home purchasers testified that they delivered cash in payment for extras--respectively $10,750 in 1995, $50,000 in 1994, and a total of $105,805 in 1994 and 1995. None of these cash payments were recorded on Gambone Brothers' books. Furthermore, Robert Sylvester, Jack Gambone's brother-in-law, testified that he resided with the Gambones for 20 years and that he frequently observed Jack Gambone in possession of sums

of cash. He testified that Jack would tell his wife, Sandra, to hide the cash until she could use it to buy savings bonds, which, Jack told Sylvester, were a good vehicle for hiding cash inasmuch as the income from the bonds is not reported to the IRS until they are cashed.

Sylvester also testified that he once saw Jack in possession of $30,000 in cash, and that on another occasion he accompanied Sandra to the bank, where she purchased $60,000-70,000 in savings bonds. When Pennsylvania state police officers executed a search warrant at Jack's house on August 25, 1994, they located $60,000 in a safe and $12,000 in Jack's nightstand. When a federal search warrant was executed on December 6, 1995, $65,815 was seized from the safe, of which $30,000 belonged to Sylvester. Bank records revealed that Sandra paid a total of $62,750 in cash to purchase savings bonds between June 24, 1994, and July 21, 1995. Moreover, Gaasche testified that in 1995 Jack told him that the FBI had been "snooping around," and that he should record

$150,000, which Jack had received and split with Tony, on the company's records. Taken together, this evidence is sufficient to sustain a finding by the jury that Jack and Tony Gambone conspired to defraud the United States by skimming cash from Gambone Brothers and failing to report that cash on their personal income tax returns.

By discussing the evidence only on the first two prongs of the conspiracy indictment we do not imply that the evidence did not support a conviction on the basis of the third prong. Rather, we do not find it necessary to discuss that evidence. We do note, however, that there was substantial evidence to support it.

B. Improper Remarks During Rebuttal

1. Standard of Review

The Gambones argue that they are entitled to new trials by reason of the prosecutor's improper statements in her rebuttal closing argument. We make a harmless error analysis when deciding whether a new trial is warranted because of improper remarks made by the prosecutor during closing arguments. See United States v. Zehrbach, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc). "The harmless error doctrine requires that the court consider an error in light of the record as a whole, but the standard of review depends on whether the error was constitutional or non-constitutional. . . . [N]on-constitutional error is harmless when 'it is highly probable that the error did not contribute to the judgment.' . . . 'High probability' requires that the court possess a 'sure conviction that the error did not prejudice' the defendant." Id. (citations omitted). If the error was constitutional, the court may affirm "only if the error is harmless beyond a reasonable doubt." United States v. Molina-Guevara, 96 F.3d 698, 703 (3d Cir. 1996).

2. Analysis

In opening statements, the prosecutor set forth the evidence the government planned to introduce to corroborate Sylvester's testimony regarding the Gambones' plot to skim cash from the company and to hide that cash by purchasing savings bonds:

> And later, based on . . . information [provided by Sylvester], search warrants were executed, . . . and guess what, they corroborated what Mr. Sylvester said. A year later in '95 . . . over $65,000 cash and almost a million dollars face value savings bonds were found in a safe in Jack Gambone's house. And you'll hear how many of those savings bonds were purchased with cash from a bank representative.

J.A. at 184. Later in the trial, however, the court excluded evidence of the bonds because the government was unable to lay a foundation for admission of any but a small fraction of the bonds ($62,750, as discussed above) by showing that they were purchased with cash.

In his closing, Thomas A. Bergstrom, counsel for Tony Gambone, after reviewing impeachment evidence concerning Sylvester's incentive to lie to obtain a lesser sentence for a drug conviction, raised the bond issue:

> And I'm going to tell you this because part of me says stay away from it, Bergstrom, but part of me says you've got to know, because you heard it in the Government's opening argument. They came in front of you and argued to you, three and a half weeks ago, that there's a million dollars in bonds. Well, guess what? There isn't a million dollars in bonds. They didn't show you a million dollars in bonds at all. They showed you some bonds that were purchased between June of '94 and July of '95. My recollection tells me those bonds totaled about $65,000. . . . So, you know, the Government had their moment here. They . . . opened with, the million dollars in bonds that they opened with, and that they haven't been able to prove . . . .

Id. at 3143-44. In rebuttal, the prosecutor, discussing the cash-skimming allegation, responded:

> It's all the money over all those other years. And again, they want to hide behind the fact that there's not a paper trail of cash. And they want to point their finger at Mr. Sylvester and they want to bring up that whole thing about the bonds. Well, you know, ladies and gentlemen, Judge Padova told you before Ms. Winters'

> opening that openings were about what the
> Government expected the evidence to show. And you
> saw that throughout this trial, various objections were
> made and Judge Padova would rule on them as he saw
> fit and you saw that evidence was excluded. So, if
> there's things we've said we were going to prove that we
> didn't, don't hold it against us. You heard the
> objections they made.

Id. at 3163-64.

At that point, Bergstrom objected. The court overruled the objection, stating that he would charge the jury"on that subject." The jury instructions, however, included only general statements as to the burden of proof, the fact that the defendants need not produce any evidence, the manner of ruling on objections according to the rules of evidence, and the fact that statements and arguments of counsel are not evidence. The court did not give a specific curative instruction with respect to the prosecutor's remarks.

The parties do not dispute that the prosecutor's remarks were improper.11 In United States v. Mastrangelo, we outlined three factors to consider in determining whether improper comments are prejudicial: the scope of the comments within the context of the entire trial, the effect of any curative instructions given, and the strength of the evidence against the defendant. 172 F.3d 288, 297 (3d Cir. 1999); see also United States v. Zehrbach, 47 F.3d at 1265.

---

11. The government appears to have abandoned an argument it raised in the district court, that the "invited error" doctrine should apply. That doctrine "teaches that where a prosecutorial argument has been made in reasonable response to improper attacks by defense counsel, the unfair prejudice flowing from the two arguments may balance each other out, thus obviating the need for a new trial." United States v. Pungitore, 910 F.2d 1084, 1126 (3d Cir. 1990) (citing United States v. Young, 470 U.S. 1, 12-13, 105 S.Ct. 1038, 1045 (1985)). The doctrine does not apply, however, where defense counsel's attacks are proper,"vigorous advocacy." Molina-Guevara, 96 F.3d at 705. As the district court found, defense counsel did nothing improper by pointing out that the government did not prove every fact alleged in the indictment or raised in opening statements. The government has not advanced the invited error theory on appeal.

21

The third factor, the strength of the evidence against the Gambones, weighs in favor of the government. It should be noted at the outset that the substance of the prosecutor's remarks establishes at most the purchase of bonds, not illegal bond acquisition. Nevertheless, any prejudicial effect from the prosecutor's remarks would go to evidence of cash-skimming, the first prong of the conspiracy count. The government needed to prove only one prong in order to establish a conspiracy, and the district court found that two other prongs were proven. Further, the jury had the

witness testimony of Robert Sylvester upon which to base a prong one verdict, and we have held that probative evidence on the same issue as improper remarks may mitigate prejudice stemming from those remarks. Gambone, 167 F. Supp.2d at 827; see United States v. Helbling, 209 F.3d 226, 242 (3d Cir. 2000) ("[A]lthough the prosecutor's comments may have been a pointed assertion of Helbling's guilt, the characterizations were related to the charges contained in the indictment which the evidence presented later did in fact establish. Accordingly, we find prejudice to be lacking.").

Similarly, the first factor, the scope of the improper comments within the context of the whole trial, weighs in favor of the government. Not only was the Sylvester testimony presented as evidence of cash-skimming, the government successfully introduced evidence concerning approximately $65,000 in bonds to corroborate Sylvester's testimony.12 Although this amount falls short of a million,

_____

12. The Gambones argue that the effects of the prosecutor's comments seeped well beyond the confines of the cash-skimming prong, infecting the entire trial with unsupported, "jury-arousing" allegations. They argue that the prosecutor's use of the word "objections" was meant to refer to the over 200 defense objections sustained during the trial: "[T]he jury simply could not have understood the government's egregious remarks as restricted to the prong 1 conspiracy. The explicit references to other excluded evidence could only lead the jury to conclude that there was all sorts of evidence of the defendant's guilt which was being kept from them by the defense objections." Joint Br. of Appellants at 42-43. We reject this argument, which makes ambitious use of the prosecutor's pluralization of the word "objection" when we consider it in the context of the rebuttal argument as a whole. Defense counsel only mentioned the bonds when discussing Sylvester's credibility and testimony concerning the cash-skimming scheme, and the government only referred to defense "objections" while discussing this same point.

22

as a legal matter the value of the bonds is not a critical factor in determining whether there was an unlawful conspiracy. Further, the prosecutor's objectionable comment amounts to less than half of a page out of over 3200 pages of trial transcript prior to jury deliberations. It represented only a fleeting moment in a four-week trial, in which the court sustained more than 200 objections by the defendant.

Thus, the district court was correct to distinguish this case from United States v. Mastrangelo, 172 F.3d 288, and Molina-Guevara. In Mastrangelo, the parties had stipulated that the defendant "had the chemical background to know the ingredients and equipment necessary to make methamphetamine," although the defendant had refused to stipulate that he knew how to make the drug. Id . at 295. In his closing, the prosecutor remarked both that the stipulation suggested that the defendant "knew . . . how to make methamphetamine" and that there was no evidence of

anyone else in the conspiracy knowing how to make methamphetamine. Id. at 296. We held that these statements were improper because they mischaracterized the evidence in the record and impermissibly shifted the burden to the defendant to produce exculpatory evidence, influencing the case outcome. Id. at 296-97.

The Gambones argue that the prosecutor's statements impermissibly shifted the burden of proof by "telling the jury to hold any gaps in the evidence against the defendants." Joint Br. of Appellants at 41. We reject this argument as the court made clear in its charge that the burden of proof throughout the case remained with the government and, in any event, even without the court's charge we are satisfied that the prosecutor's statements would not have had the effect that the Gambones suggest. In this regard, we point out that Mastrangelo is distinguishable as the prosecutor's remarks here at most explained the reason for the government's failure of proof and thus did not imply that the Gambones had any obligation to produce exculpatory evidence. Moreover, there was substantial evidence to support all the prongs of the conspiracy count including witness testimony about cash-skimming to which the prosecutor's statements did not relate.

Similarily, Molina-Guevara is distinguishable from this case. In Molina-Guevara the government called one customs agent to testify to the defendant's involvement in a drug conspiracy but chose not to call a second agent who also had questioned the defendant. After counsel for the defendant challenged the witness' credibility during his closing argument, the prosecutor suggested during rebuttal that counsel for the defendant did not call the second agent to testify because that agent would have corroborated the testimony of the first agent. 96 F.3d at 703. In Molina-Guevara, the prosecutor's comments about the credibility of government agents was influential of case outcome, as it determined the crucial issue of whether defendant was involved in a drug conspiracy. Id. at 705. In this case, other evidence established the conspiracy.

Thus, the first and third factors weigh very strongly in the government's favor. As a result, even though no specific curative instruction was provided to the jury, we hold that the error was harmless beyond a reasonable doubt, and the Gambones are not entitled to a new trial by reason of the prosecutor's comments. Accordingly, we need not determine whether the comments constituted constitutional or nonconstitutional error, as the higher standard is met.

C. Prejudicial Spillover

"Generally, invalidation of the convictions under one count does not lead to automatic reversal of the convictions on other counts." United States v. Pelullo , 14 F.3d 881, 897 (3d Cir. 1994). "[P]rejudicial spillover analysis under Pelullo

begins by asking whether any of the evidence used to prove the reversed count would have been inadmissible to prove the remaining count (i.e., whether there was any spillover of inadmissible evidence). If the answer is 'no,' then our analysis ends, as the reversed count cannot have prejudiced the defendant." United States v. Cross, 308 F.3d 308, 318 (3d Cir. 2002). If there was any spillover, we must ask whether the error was harmless, that is, whether it is highly probable that the error did not prejudice the jury's verdict on the remaining counts. Id. at 318-19.

The Gambones' arguments on this issue center on the assertion that they also advanced with respect to their

insufficient evidence argument on the conspiracy count, that the government failed to prove that they "engaged in a colossal 20 year tax fraud scheme whereby enormous amount of cash were skimmed from their business and omitted from their tax returns each year from 1975 to 1995." Joint Br. of Appellants at 49. They argue that the evidence of such a plot was "non-existent," a position belied by the evidence already summarized. The Gambones further suggest that any evidence that was admitted in support of the personal tax evasion counts (not only the conspiracy count, but also the substantive counts as to which the district court granted judgments of acquittal) amounted to nothing more than unsupported "jury-arousing" accusations that portrayed the defendants as massive tax evaders who wished, in the words of the prosecutor, "to cheat the IRS in as many ways as they could." J.A. at 3050. The Gambones conclude that, because those characterizations were, in their eyes, proven to be inaccurate, the spillover effect of the jury-arousing statements tainted the entire trial, requiring that we reverse their convictions on the counts that survived the district court's order partially granting their motions for judgments of acquittal.

As we discussed above in detail, there was sufficient evidence to sustain the conspiracy conviction on either of the government's first two theories, that is, on the cash-skimming prong and the "overtime / expense reimbursement / 'off-payroll' fraud" prong. The unsubstantiated counts are therefore Counts Two and Three charging the Gambones with the substantive offenses of subscribing to false personal tax returns for the year 1994.[13] The district court granted the Gambones' motions

_____

13. We recognize that the jury found the Gambones not guilty on two of the 61 counts charging them with aiding and assisting in the preparation of their employees' false individual income tax returns. It is clear, however, that inasmuch as the jury convicted the Gambones on the remaining 59 of these counts and the court denied their motions for acquittal on those counts, there could not possibly have been a spillover effect from the evidence on the two counts on which they were acquitted, and the Gambones do not contend otherwise. Rather, they contend that

reversal of the remaining 59 counts "for insufficiency will also require [us] to assess the spillover effect of those invalidated counts." Joint Br. of Appellants at 50 n.9. Of course, inasmuch as we are affirming the convictions on these counts we need not make the analysis that the Gambones believe might be necessary.

for judgment of acquittal on these charges because the government had not introduced evidence that would allow the jury accurately to pinpoint exactly when they received cash from the company that may have gone unreported. Gambone, 167 F. Supp. 2d at 815-17. Nevertheless, the district court reasonably found that evidence was presented to suggest that the business received substantial amounts of cash and that the Gambones received distributions of this cash at some point, though it ultimately found that there was not evidence suggesting that the Gambones received the cash in 1994. Id.

The evidence introduced to prove Counts Two and Three also would have been admissible at a trial limited to the remaining valid counts. That evidence, which focused on the allegedly false personal tax returns for the year 1994, was merely a subset of the evidence supporting the government's allegation that the Gambones engaged in a long-running conspiracy to defraud the United States by skimming cash and failing to report that cash on their personal income tax returns. The Gambones seek to characterize that evidence of the false 1994 returns as jury-arousing. If that evidence contributed to a picture of the Gambones as major tax evaders over the course of 25 years, however, it is for good reason; that is exactly what was alleged in Count One, on which the jury convicted the Gambones. Thus, although the evidence introduced to support Counts Two and Three, according to the district court, would not have allowed a reasonable jury to pinpoint the exact year in which the Gambones skimmed cash that may have gone unreported, that evidence would have been admissible at a trial on the cash-skimming conspiracy charge. Our analysis need continue no further. Nonetheless, we also note that, inasmuch as there was very strong evidence to sustain a conviction under the second prong of the conspiracy count, i.e., the underreporting of employees' wages, and to sustain the convictions on the 59 counts of aiding and assisting in the preparation of employees' false returns, even if there had been impermissible spillover, any error would have been harmless. Thus, we are satisfied that the Gambones are not entitled to new trials predicated on an adverse spillover effect from the counts on which they were acquitted.

D. Jury Instructions

1. Standard of Review

The Gambones contend that they are entitled to reversals and new trials on the aiding and assisting counts because the court's instructions on those counts were erroneous. Inasmuch as they did not object to the instructions at trial, we examine the charge for plain error. See United States v. Retos, 25 F.3d 1220, 1228 (3d Cir. 1994). Thus, for us to grant them relief "[t]here must be an 'error' that is 'plain' and that 'affects substantial rights.' Moreover,[Fed. R. Crim. P.] 52(b) leaves the decision to correct the forfeited error within the sound discretion of the Court of Appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " Id.  (quoting United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776 (1993)). "[I]t is a rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." United States v. Gordon, 290 F.3d 539, 545 (3d Cir. 2002) (internal quotation marks omitted).

2. Analysis

The Gambones challenge the portion of the jury charge relating to the aiding and assisting counts in which the district court stated: "I instruct you as a matter of law that if you find beyond a reasonable doubt that a defendant willfully furnished, prepared or caused to be prepared false and fraudulent documents which the defendant knew would be relied on in the preparation of income tax returns and would result in returns which were materially false . . . then the Government has met its burden of proof in this element . . . ." J.A. at 3257.

When reviewing a jury instruction for plain error, the "analysis must focus initially on the specific language challenged, but must consider that language as part of a whole." Gordon, 290 F.3d at 544. We recognize that if taken in isolation the challenged instruction would be erroneous as a juror reasonably could interpret it as allowing a conviction even though the Gambones merely had provided employees with false W-2s without further encouraging

27

them to file false tax returns. In context, however, the error is not plain. The instruction on this point began:

> Okay. Now let's focus on aiding and abetting. What is it, what can it be? Where should your focus be with respect to whether there has been aiding and abetting?
>
> First let me state that it is not enough, it is not enough for the Government to establish only that the individual taxpayers listed in Count 7 through 67 received a Form W-2 that did not include all of their income. That's not enough to make the charge. If that's all there is, it's not enough to make the charge.
>
> In order for the Government to establish that

Anthony Gambone or John Gambone aided and abetted those individuals in filing a false return, you must find first that the return they filed was indeed false. Secondly, that the individual taxpayer in fact had income from Gambone Brothers that was not reported on this tax return; thirdly, that the failure to report was the cause of the unlawful assistance of the defendant; and fourthly, that besides giving the taxpayer an incorrect Form W-2, Anthony or John Gambone did something else to aid that particular taxpayer in filing [a] false return, besides proving an incorrect Form W-2 or transmitting an incorrect W-2.

And as to each taxpayer, members of the jury, you must affirmatively decide that the Government has proven beyond a reasonable doubt that the defendant did something to aid and assist that taxpayer besides simply and only providing an incorrect W-2 form. And you have heard all of the evidence with respect to everything that was going on. You don't have to determine what was going on, and then determine whether there was aiding and assisting under the definition as I've just given it to you.

J.A. at 3255-56 (emphasis added). After an additional paragraph the court gave the challenged portion of the charge.

In the four paragraphs of the charge that we have quoted, the district court made abundantly clear that the

28

jury could not convict the Gambones on the aiding and assisting counts unless the jury found that they engaged in conduct beyond simply providing false W-2s. Thus, even though the challenged portion of instruction in itself is not consistent with four paragraphs we have quoted, 14 and the court's use of the phrase "as a matter of law," was erroneous, in the context of the charge as a whole this statement was not prejudicial. Indeed, it is probably for exactly that reason that the Gambones' attorneys did not object to the charge at the trial. Furthermore, given the substantial evidence pointing to the Gambones' guilt and the overall fairness of the proceedings, any error clearly did not affect substantial rights. See Retos, 25 F.3d at 1229 (stating that, under plain error analysis, the court of appeals will exercise its discretion to order correction where the defendant is actually innocent or where the error seriously affects the fairness, integrity, or public reputation of judicial proceedings). The instruction was therefore not plainly erroneous and the Gambones are not entitled to new trials by reason of it.

III. CONCLUSION

For the foregoing reasons the district court properly denied the Gambones' motions for new trials and acquittals and the judgments of convictions and sentence entered

December 13, 2001, will be affirmed.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

---

14. The contradiction, however, is not as flat as the Gambones suggest. The challenged instruction refers to "false and fraudulent documents" rather than specifically to W-2s, the only inappropriate document to consider without additional proof of encouragement.

29