NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3378
_____

UNITED STATES OF AMERICA

v.

TYRONE BENTLEY,

Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 10-cr-00525-001)
District Judge:  Honorable Paul S. Diamond
_____

Submitted Under Third Circuit LAR 34.1(a)
June 13, 2013

Before:  SCIRICA, HARDIMAN and ALDISERT, *Circuit Judges*.

(Filed: June 14, 2013)
_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

Appellant Tyrone Bentley was convicted by a jury in the Eastern District of

Pennsylvania of conspiracy to commit armed bank robbery in violation of 18 U.S.C.

§ 371, armed bank robbery and aiding and abetting in violation of 18 U.S.C. §§ 2113 and

2, and using and carrying a firearm during and in relation to a crime of violence and aiding and abetting in violation of 18 U.S.C. §§ 924(c) and 2. He argues that the District Court erred in denying his motion to suppress physical evidence and that the verdict against him was supported by insufficient evidence. For the reasons that follow, we will affirm.

I

On July 3, 2010, Bentley and an accomplice entered the Wachovia Bank in Trevose, Pennsylvania wearing masks and gloves. Bentley carried a taser and a pink pillowcase, and his accomplice carried a firearm. Bentley's accomplice grabbed the bank manager and held him at gunpoint by the front door, while Bentley jumped over the counter.

Once behind the counter, Bentley threatened the tellers with his taser and ordered them to open their cash drawers. He walked down the teller line, taking money and stuffing it into his pillowcase. Some of the money was wrapped with paper straps, which were labeled with the bank's name, the date, the bank's branch number, the teller number, and the initials of the teller from whose drawer the money was taken. Bentley also took bait bills.

Bentley and his accomplice then ran out of the bank, jumped into a silver Dodge Caravan minivan with dents on both sides, and drove away. Bentley nearly struck a bus while pulling out of the parking lot. At a nearby red light, the driver of the bus pulled up

2

next to the minivan and observed that Bentley and his accomplice were wearing hoods, gloves, and masks. The bus driver called the police and reported that the minivan was driving south on Route 1. This information was broadcast over police radio.

Pennsylvania State Trooper Justin Oliverio overheard the transmission and proceeded south on Route 1. Within three or four minutes, he saw a silver minivan. As Trooper Oliverio traveled alongside the minivan, he observed the driver—a black male with facial hair, whom he later identified as Bentley—for about three to five seconds. The minivan then drove across the grass median of the highway and sped away.

Trooper Oliverio, joined by Bensalem Township police officer John Domanico, chased the minivan at speeds up to 84 miles per hour. The officers briefly lost sight of the minivan when it turned into a residential neighborhood in Northeast Philadelphia, but relocated it soon thereafter. It was parked about three blocks away from the street where the officers had last seen it, it was missing its license plate, and the driver and the passenger were gone.

Another police officer, Michael Sheehy, had also responded to the report of the robbery and was searching the Northeast Philadelphia neighborhood for the suspects. He saw Bentley walking down the sidewalk a short distance from the parked minivan. Sheehy observed Bentley reaching toward the front left side of his waistband, and was concerned that he might be carrying a gun. He ordered Bentley to show him his hands, and Bentley began to run. Sheehy, joined by several other officers, pursued him. Bentley

3

was eventually grabbed by a police officer but continued to struggle, punching and kicking at the officers and shouting obscenities. Once Bentley had been subdued, Trooper Oliverio arrived at the location and positively identified him as the driver of the silver minivan. Trooper Oliverio also identified the parked minivan as the van involved in the chase.

After Bentley's arrest, Philadelphia police officers continued to search for the gun in the surrounding area. Officer Sheehy retraced the path that he had taken while chasing Bentley. Although he did not find the firearm, a neighbor told him that he had seen Bentley get out of the minivan, remove the license plate, and hide it on a nearby property. The license plate was ultimately recovered, and police later confirmed that it had been registered in Bentley's name. The van was also registered to Bentley.[1]

During the search for the firearm, two other officers approached the parked minivan and looked through the windows. They could see a bulging pillowcase inside, tied at the top. The pillowcase was so thin that the officers were able to identify its contents as U.S. currency. When the firearm could not be found in the surrounding neighborhood, the officers decided to search for it inside the unlocked minivan. One of the officers briefly looked around the vehicle and under the seats, but did not touch the pillowcase. He did not find the missing firearm.

---

[1] The key to the van was also later found hidden in the patrol car in which police had transported Bentley to the police station.

The gun was not found, and Bentley's accomplice was never apprehended. The minivan was eventually moved to the Bensalem police headquarters, and officers conducted a thorough search of the vehicle after obtaining search warrants. They found the taser and the pillowcase, which contained $38,182, some of which was in bundles, held together by Wachovia paper straps, and $200 of which was bait money.

Prior to trial, Bentley filed a motion to suppress the evidence that had been recovered from the minivan, arguing that the evidence had been obtained in violation of the Fourth Amendment. He also moved to suppress Trooper Oliverio's identification of him as the driver of the minivan because, he claimed, the identification was the result of an unlawful arrest. The District Court determined that both the evidence from the minivan and Trooper Oliverio's identification were admissible.

Bentley was convicted of all charges on January 6, 2012. He filed a motion for a judgment of acquittal and for a new trial on August 17, 2012. The District Court denied the motion as untimely, and noted in the alternative that the motion was meritless. Bentley appealed.

## II[2]

Bentley raises two challenges on appeal. First, he contends that the District Court erred in admitting the evidence discovered in the minivan because it was searched in

___

[2] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

5

violation of the Fourth Amendment. Second, he argues that there was insufficient evidence to support his conviction. We find both arguments to be without merit.

A

Bentley first contends that the District Court erred in admitting the evidence discovered in the minivan because the officers' initial, warrantless search of the vehicle was unlawful. We review the District Court's denial of the motion to suppress for clear error as to the underlying factual findings, and we exercise plenary review over the Court's application of the law to the facts. *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

Police generally do not need a warrant to search a readily mobile vehicle so long as they have probable cause to believe that the vehicle contains contraband or evidence of a crime. *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996); *Gov't of Virgin Islands v. Rasool*, 657 F.2d 582, 586–87 (3d Cir. 1981). There is no question that, at the time of the search, police had probable cause to believe that Bentley's minivan contained contraband or stolen goods. Bentley argues, relying on the Supreme Court's plurality opinion in *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), that police may still be required to obtain a warrant when the normal concerns that justify the automobile exception—such as the risk of flight and impracticality of obtaining a warrant—are not present. *See id.* at 461 ("The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears."). He claims that the automobile exception does not apply in

this case because he was no longer occupying his vehicle when it was discovered, and so there was no risk of flight. Under these circumstances, he claims, it would not have been impracticable for the police to obtain a warrant.

Warrantless searches of vehicles have, however, been found lawful even "in cases in which the possibilities of the vehicle's being removed or evidence in it destroyed were remote, if not nonexistent." *Cady v. Dombrowski*, 413 U.S. 433, 441–42 (1973); *see also Labron*, 518 U.S. at 939–40 (automobile exception applied to the warrantless search of defendants' vehicles, even though the defendants had already been arrested at the time of the search and no exigent circumstances existed). This is because, "[e]ven in cases where an automobile [i]s not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justifie[s] application of the vehicular exception." *California v. Carney*, 471 U.S. 386, 391 (1985). Thus, officers can generally search readily mobile vehicles without a warrant as long as they have probable cause, even if there is no immediate risk of flight. *Labron*, 518 U.S. at 940.

Bentley's reliance on *Coolidge*—which, in light of the Supreme Court's more recent decisions, provides at most a very narrow carve-out to the automobile exception— is unavailing. In *Coolidge*, police seized the defendant's car from his driveway and searched it pursuant to an invalid warrant. 403 U.S. at 447, 449, 458. The Supreme Court rejected the Government's argument that the search was nevertheless permissible under the automobile exception. Police had suspected that the defendant's car contained

7

evidence of a murder for some time before conducting the search, and the defendant, who was aware that he was a suspect, had cooperated with the police throughout the investigation. *Id*. at 460. The Court explained:

> [T]here is nothing in this case to invoke the meaning and purpose of [the automobile exception]—no alerted criminal bent on flight, no fleeting opportunity on an open highway after a hazardous chase, no contraband or stolen goods or weapons, no confederates waiting to move the evidence, not even the inconvenience of a special police detail to guard the immobilized automobile. In short, by no possible stretch of the legal imagination can this be made into a case where "it is not practicable to secure a warrant," and the "automobile exception," despite its label, is simply irrelevant.

*Id*. at 462 (internal citation omitted).

Here, in contrast, the search of the vehicle occurred almost immediately after the bank robbery. Police suspected that the minivan contained the stolen money and weapons, and they had reason to be concerned about the actions that Bentley's accomplice might take. Bentley was no longer capable of flight at the time of the search, but his accomplice, who was never apprehended, was presumably still in the area. Also significant is the fact that Bentley abandoned the minivan on the side of the road; the police did not need to enter private property in order to search the vehicle. *See Cardwell v. Lewis*, 417 U.S. 583, 593 (1974) (distinguishing *Coolidge* on the grounds that the *Coolidge* vehicle "was parked on the defendant's driveway," and so "the seizure of that automobile required an entry upon private property"). Thus, the automobile exception applies, and the District Court did not err when it held that police were not required to

8

obtain a warrant before searching the minivan.[3]

B

Bentley also argues that the Government did not produce sufficient evidence to support the verdict. We generally exercise de novo review over a district court's denial of a motion for judgment of acquittal, and must "sustain the verdict if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision." *United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006) (quoting *United States v. Gambone*, 314 F.3d 163, 169–70 (3d Cir. 2003)). Here, Bentley failed to file a timely motion for judgment of acquittal,[4] so we review his sufficiency of the evidence claim for plain error. *United States v. Powell*, 113 F.3d 464, 466–67 (3d Cir. 1997). The applicable standard of review makes little difference in this case, however, as the Government produced ample evidence to support a guilty verdict.

At trial, Wachovia employees provided detailed testimony about both the robbery and Bentley's getaway vehicle, and police officers described at length the chase that

---

[3] The District Court also provided several other justifications for upholding the search of the minivan. Because we find that the automobile exception applies, we need not discuss these other justifications in depth. We note, however, that we agree with the District Court's determination that the evidence would also be admissible under both the independent source doctrine and the inevitable discovery doctrine.

[4] *See* Fed. R. Crim. P. 29(c)(1) (defendant may move for a judgment of acquittal within 14 days after a guilty verdict or after the court discharges the jury); *see also* Dkt. 103 (motion for acquittal filed August 22, 2012); App. 22–23 (denying Bentley's motion for judgment of acquittal, filed seven months after trial, as untimely).

ensued when they found Bentley and his accomplice on Route 1. Although the police briefly lost sight of Bentley, they soon rediscovered the abandoned minivan, and they found Bentley close by. The police then found the money that had been stolen from Wachovia and the taser in the minivan. A subsequent investigation established that the minivan belonged to Bentley.

Bentley primarily argues that one specific piece of evidence—Trooper Oliverio's identification based on the Route 1 chase—was not sufficiently reliable to support a guilty verdict. He emphasizes the fact that Trooper Oliverio saw the driver for only three seconds before the chase commenced, and he claims that the pre-trial identification was conducted in a suggestive manner.[5] This argument fails to persuade because the jury had ample evidence on which to convict Bentley, with or without Trooper Oliverio's identification.

III

For the foregoing reasons, we will affirm Bentley's judgment of conviction.

---

[5] Bentley also suggests that, because of its unreliability, Trooper Oliverio's identification should have been suppressed. Bentley waived this argument, however, when he failed to raise it in the District Court. *See United States v. Rose*, 538 F.3d 175, 182 (3d Cir. 2008) ("[A] suppression argument raised for the first time on appeal is waived (*i.e.*, completely barred) absent good cause."); *see also* Dkt. 41 (arguing only that the District Court should suppress "any identification made *as a result of Mr. Bentley's unlawful arrest*" (emphasis added)). Bentley has not identified any justification for his failure to raise the issue below.

10